[No. B203691. Second Dist., Div. Eight. Sept. 9, 2009.]

JOHN DANIEL WILLIAMS et al., Plaintiffs and Respondents, v. HILB, ROGAL & HOBBS INSURANCE SERVICES OF CALIFORNIA, INC., Defendant and Appellant.

COUNSEL

Lewis Brisbois Bisgaard & Smith, Roy G. Weatherup; Hinshaw & Culbertson and Frances M. O'Meara for Defendant and Appellant.

Vastano & Angarella, Patrick G. Vastano and Steven V. Angarella for Plaintiffs and Respondents.

## OPINION

## BENDIX, J.[*]—

### SUMMARY

This case involves the liability of an insurance agency for negligence in advising on, procuring, and maintaining an insurance package for a new business venture that did not include workers' compensation insurance. The lack of workers' compensation insurance was discovered after an employee was injured in a catastrophic fire during the third year of business operations. After a lawsuit in which the employee obtained a multimillion dollar judgment against the owners of the business, this suit was filed by the owners against the insurance agency. The court, following a bench trial, found the insurance agency liable, and entered judgment in favor of the owners in the amount of the judgment that remained outstanding in the underlying case. The insurance agency appeals, claiming (1) the evidence was insufficient to support a finding of negligence on its part largely because the evidence did not support any duty owed to the insured, (2) the action was barred by the statute of limitations, and (3) the trial court erred in refusing to find comparative negligence on the part of the owners, who failed to read their insurance policies.

We find no error and affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

John Daniel Williams and Steven Stuart Simon were boyhood friends in Oklahoma, where Williams still lives and owns his own mortgage brokerage business. Simon moved to California, and was employed by Rhino Linings of San Diego. Rhino Linings USA, Inc. (Rhino USA), is an enterprise with dealerships throughout the country; the dealerships are engaged in the business of installing spray-on linings onto the beds of pickup trucks. Rhino USA sells dealerships, providing new owners with spray equipment, supplies, and the like. Simon proposed to Williams that the two should obtain a dealership from Rhino USA, to be located in Santa Fe Springs; Williams would provide most of the financing and Simon would be responsible for sales and managing the business onsite. Williams agreed, and the two became partners in the venture. Williams remained in Oklahoma, but was responsible for financial and administrative matters, including insurance.

Williams and Simon opened the business—Rhino Linings of Santa Fe Springs (Rhino SFS)—some time in 1999. Rhino USA referred Williams to

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Robyn Thaw, who was then employed by the Robert F. Driver Company, an insurance agency. Williams understood that Thaw knew the Rhino Linings operation very well, that she had a custom-made insurance package specific to the Rhino Linings operation, and that she "was the go-to person to take care of the insurance needs for Rhino Linings dealerships." Williams, who was in California at the time arranging a lease for the site of the business, called Thaw in January 1999 and asked to meet with her to review insurance needs. Thaw told Williams a meeting would not be necessary, because she was very familiar with Rhino Linings dealerships and programs, and "was the expert on the product necessary to satisfy [Rhino SFS's] insurance needs." Williams did not request any specific type of insurance (and did not know enough about what kind of insurance was needed to make a specific request), instead asking Thaw for whatever insurance was needed to operate the business.

Thaw sent Williams a blank application form by fax, indicating that the program was "designed specifically for Rhino Liners dealers." Williams filled in basic information, leaving all portions relating to insurance coverages blank. He signed the application, and returned it to Thaw, who selected the insurance coverages. Thaw did not send the application (which had a section for workers' compensation insurance) back to Williams after she completed it. Thaw submitted the application to Travelers Insurance Company.

Thaw had considerable experience with insurance for Rhino Linings dealerships. Rhino USA had become a client of Thaw's in the early to mid-1990's and, by 1999, Thaw was handling the insurance needs of some 50 to 100 Rhino Linings dealerships. Thaw had met with Travelers Insurance personnel and helped design and develop the Rhino Linings dealership insurance package. Thaw participated in risk analysis with the Travelers underwriters, and visited Rhino USA, observing the product that was sprayed on the truck beds and the equipment used by the sprayer, including the breathing apparatus worn during application of the lining. She was aware that sprayers had the most dangerous jobs and that it would be important for a sprayer's employer to know if its insurance provided no coverage for a sprayer's on-the-job injuries. Thaw knew that workers' compensation insurance is mandatory in California.

Thaw attended informational seminars for new dealers given by Rhino USA, and spoke at the seminars about the insurance needs of Rhino Linings dealerships. The package of insurance coverages Thaw participated in designing for Rhino Linings dealerships was not available through all Traveler agents; brochures with Thaw's name on them were distributed at the Rhino USA seminars at which she spoke. Thaw represented and marketed the insurance package as having been specifically designed for Rhino Linings dealers.

After Thaw submitted Williams's application to Travelers, she sent Williams an insurance proposal for Rhino SFS, which Williams accepted "as is." The proposal included, among other coverages, commercial general liability coverage, including "personal and advertising injury" with a $1 million limit, and the "premium basis" showed one full-time employee (consistent with Rhino SFS's intention to employ one sprayer, who was to be paid $2,000 a month). A copy of the policy, issued by Travelers for a one-year period effective January 25, 1999, was mailed to Rhino SFS's address in Santa Fe Springs a month or so later, but Williams did not receive a copy until late April 1999. Williams "scanned it briefly," and "it looked like everything was complete and in order"; Williams believed he had "all the appropriate insurance coverages that [he] needed to operate [his] business." In fact, the policy did not include workers' compensation coverage, and did not include any coverage for injury to an employee such as the sprayer who dealt with toxic materials used for lining the truck beds.[1]

By the time the one-year Travelers policy expired in January 2000, Thaw had changed her employment and had begun working for Timothy Stuart Mills Insurance Services, a predecessor company of Hilb, Rogal & Hobbs Insurance Services of California, Inc. (collectively, HRH). Thaw continued to act as insurance agent for Rhino SFS after she began working for HRH. By January 2000, Travelers was no longer offering the Rhino Linings insurance package, so Thaw, while employed by HRH, created a new insurance package, underwritten by Hartford Casualty Insurance Company, by using a Hartford "Spectrum" policy and adding additional coverages necessary for Rhino Linings dealerships, such as garagekeepers coverage. Again, the package she created for Rhino SFS from Hartford did not contain workers' compensation insurance. In January 2001, the Hartford policy was renewed, again without workers' compensation insurance; this time neither Thaw nor anyone at Hartford spoke to Williams or anyone else at Rhino SFS when the policy was renewed.

In July 2001, a fire at the Rhino SFS premises resulted in severe burn injuries to Kendall Mann, then the sales manager for Rhino SFS. When Williams called Thaw to report the fire, he learned for the first time that Rhino SFS did not have the necessary workers' compensation coverage.

Mann brought a civil action against Rhino USA, Rhino SFS, Williams and Simon. Williams and Simon were provided a defense and were represented by Hartford-appointed counsel. The jury brought in a verdict against Rhino USA and Rhino SFS (the latter including Williams and Simon, jointly and

---

[1] The policy contained an exclusion to the coverage for bodily injury, stating that the insurance did not apply to bodily injury to an employee arising out of and in the course of employment.

severally) for $11,272,238.39, finding Rhino USA and Rhino SFS each 50 percent at fault. Judgment was entered on the jury verdict on March 2, 2004. Hartford paid $1 million in partial satisfaction of Mann's judgment against Williams and Simon, leaving approximately $5.8 million outstanding on the judgment.

Williams and Simon (collectively, Williams) then filed this negligence action against HRH and the Robert Driver agency on July 5, 2005, seeking compensatory damages in the amount outstanding on the Mann judgment. The Driver agency obtained summary judgment, and no appeal was taken from that judgment.[2] HRH sought summary judgment on the ground that the statute of limitations had run, but its motion was denied, the court (Judge Raul Sahagun) finding the statute did not begin to run until March 2, 2004, when the Mann judgment was entered in an amount in excess of the general liability insurance policy limits.

The case proceeded to trial before Judge William J. Birney, Jr., sitting without a jury. The court heard testimony from a number of witnesses, including Williams, Simon, Thaw, Karen Williams (John Williams's wife), and experts for each side. In addition to the facts recounted above, the following evidence was adduced in respect of the procurement of Rhino SFS's insurance.

### 1. *The initial policy (January 1999).*

As it happened, Robyn Thaw's recollection of her telephone conversations with Williams in January 1999 differed from those of Williams, recounted above. Thaw testified that, prior to sending the insurance proposal to Williams, her staff had calculated premiums of $6,204 for workers' compensation insurance, based on an annual payroll of $120,000 for three full-time workers.[3] Thaw said she called Williams in order to discuss workers' compensation insurance, told him the annual premium would be $6,204, and told him workers' compensation insurance was mandatory in California, but that he could buy it from someone other than the Robert Driver agency. Thaw said Williams declined to purchase workers' compensation insurance, so the

---

[2] The court concluded summary judgment was proper because the Robert Driver agency was not the broker for the policy in effect at the time of the fire, and was not vicariously liable for its former employee's professional activities at her new place of employment (HRH). Because the policy brokered by the Driver agency had not been renewed and had been replaced by a policy package from another company through another broker, no damages were causally related to the Driver agency's negligence.

[3] Questions were raised at the trial about the $6,204 annual premium calculation based on a $120,000 payroll, because Rhino SFS planned to employ a single sprayer at $24,000 a year (and, according to the testimony, company owners need not be covered by workers' compensation insurance).

insurance proposal she sent to him did not include it. Thaw said she assumed Williams was going to buy workers' compensation insurance from someone else.[4]

Thaw admitted that she never provided Williams a written quote for workers' compensation insurance. She wrote no memorandum to the file (or to Williams) to indicate that workers' compensation coverage was offered and declined. She made no record of her telephone call with Williams about workers' compensation insurance, despite the fact that the Robert Driver agency used a printed form entitled "telephone discussion record," which stated that the form should be completed for every call. HRH's own expert testified that an "insurance agent who is using reasonable care, diligence, and judgment document[s] in the file when a client declines mandatory coverage," and sends a confirming letter to the client when the client refuses mandatory insurance coverage.

### 2. *The January 2000 policy.*

Thaw also testified about her conduct in January 2000, when the Rhino SFS insurance policy was expiring (and Travelers was no longer offering the Rhino Linings package). Thaw had then been employed by HRH (which acted as agent for Hartford) since August 1999. She testified that she was the insurance agent for Rhino SFS in January 2000 when Rhino SFS purchased the new Hartford policy. Thaw said she talked to John Williams's wife, Karen Williams, on January 21, 2000. (Karen Williams helped Rhino SFS with bookkeeping tasks from her home in Oklahoma.) Thaw claimed she talked to Ms. Williams about workers' compensation insurance, asking her if Rhino SFS would like Thaw to quote workers' compensation coverage, and Ms. Williams said she would talk to her husband and get back to Thaw. (At

---

[4] The court asked Thaw if she recalled the conversation with Williams when he declined workers' compensation insurance, and Thaw said she did. This exchange ensued:

"THE COURT: Did you, if you recall, did you remonstrate with him and say, hey, you can't do this or you shouldn't do this, or the law prohibits you from just walking away from this? You remember—I mean wouldn't that get your hackles up a little bit?

"THE WITNESS: (No audible response.)

"THE COURT: Of course. Okay. [¶] You recall, you know, coming back at him and saying, hey, wait a minute, you can't do this, or something like that, if you recall?

"THE WITNESS: Well, yes, because I had said that it was mandatory.

"THE COURT: Yeah.

"THE WITNESS: And that was his choice. He doesn't have to buy it from me.

"THE COURT: So that was your assumption? Maybe he was going to buy it from someone else?

"THE WITNESS: Yes.

"THE COURT: But, you know, it's your business. You know, he should be buying it from you as long as he is dealing with you. Okay. [¶] You can't blame me for wondering; right?

"THE WITNESS: I can't."

her deposition, Thaw testified that Ms. Williams told her that Rhino SFS did not need workers' compensation insurance.) Thaw also testified that she did not recall whether she told Ms. Williams that workers' compensation insurance was required by law, or that it was a crime not to have it; she also said she did not recall whether she asked Ms. Williams if Rhino SFS had workers' compensation insurance to cover its sprayer. (At her deposition, Thaw testified she did not ask Ms. Williams if Rhino SFS had workers' compensation insurance from another source.) Thaw also said that Ms. Williams did not tell Thaw that she wanted any specific type of coverage, and their conversation was "along the lines of we need another policy similar to what we already have."

Karen Williams testified that she spoke to Thaw a few times, but the only matters about which she spoke to Thaw were premium payments and obtaining certificates of insurance. Ms. Williams testified that her husband was the person who handled the insurance for Rhino SFS, and that if Thaw had ever asked her about insurance coverage, she would have told Thaw to talk to her husband. She testified that she never spoke to Thaw about workers' compensation insurance coverage, and was never offered workers' compensation coverage or told by Thaw that it was required in California. She said she did not decline workers' compensation insurance from Thaw, and "wasn't in a position to decline anything."

Williams spoke to Thaw on January 25, 2000, the effective date of the new Hartford policy. Thaw told him the Travelers policy was no longer in effect, but that she had "a like kind, similar-type policy in replacement of that policy," from Hartford. Williams understood that the Hartford policy would provide him "with essentially the same coverage as the Travelers policy," for a slightly higher premium, and he approved the quote Thaw gave him for the new policy. Thaw did not talk to Williams about the need for workers' compensation insurance, or about any of the particular coverages involved in the Hartford policy. Thaw did not ask him if he had workers' compensation insurance, and did not tell him that the policy would not cover his employees; Thaw did ask Williams for the names, telephone numbers and driver's license numbers of the persons working at the Rhino SFS site (Simon, Mann, and the sprayer), giving Williams the impression the employees would be covered by the insurance.

Again, Thaw's files contained no written confirmation of her claims that she had discussed workers' compensation insurance with Ms. Williams or that Ms. Williams had declined coverage.

### 3. *The January 2001 policy.*

In January 2001, the Hartford policy was renewed. Williams did not receive any telephone calls from Thaw or anyone at HRH, nor did he receive any telephone calls or requests from Hartford. Williams received an invoice from Hartford, which stated: "Thank you for renewing your insurance with The Hartford." The invoice also stated: "For Certificates of Insurance, Policy Changes, or Coverage Questions, Call: Timothy Stuart Mills Ins Srv [HRH's predecessor]/SCIC" and provided an "800" telephone number. The policy likewise showed "Timothy Stuart Mills Ins Srv/SCIC" as the agent/broker.[5]

At trial, HRH asserted that its predecessor, the Timothy Mills agency, had no authority to renew the policy in January 2001, and that only Hartford could do so. This assertion was based on an agreement between the Timothy Mills agency and Hartford (Hartford/HRH-Mills agreement), under which Hartford would handle select HRH accounts, including the Rhino SFS account, and provide "agency services" such as "commercial insurance coverage counseling and such other commercial insurance services as are typically furnished by Agent." Rhino SFS was not a party to and was never given a copy of this agreement.

Thaw testified that she was "still the insurance agent for Rhino Linings Santa Fe Springs at the time of the fire," but claimed that when the January 2000 policy (the first Hartford policy) went into effect, "Hartford became responsible at that point in time for acting as the, as the agent for the insured, the policy. They were responsible from that point forward for securing renewal information . . . or renewing the policy . . . in accordance with [the Hartford/HRH-Mills agreement]." According to Thaw, Hartford took over all of the duties that Thaw had had prior to that time, including "commercial insurance coverage counseling," and in 2001, Hartford "had a duty to provide commercial insurance coverage counseling to Rhino Linings of Santa Fe Springs."[6] Thaw and her agency received a commission for the sale of the Hartford policy in January 2001, and the agency agreement between Hartford and the Timothy Mills agency also indicated that if Hartford no longer wished to write a policy for a client of the Timothy Mills agency, that client "still belonged to [the Timothy Mills agency] . . . ."

The trial court issued a statement of decision granting judgment in favor of Williams and against HRH. The court found that:

---

[5] No one ever told Williams what "SCIC" meant, and Williams always believed that Thaw and the Timothy Mills agency were Rhino SFS's insurance agents.

[6] The trial court observed that "HRH has sued Hartford in a separate action, claiming that Hartford had a duty to procure and provide Rhino SFS with workers' compensation insurance pursuant to the [Hartford/HRH-Mills agreement]."

—Thaw "obviously acted as more than an ordinary agent," and held herself out as having expertise with respect to the insurance needs of Rhino Linings dealerships.

—In January 2000, Thaw, while employed at HRH, created a new insurance package for Rhino SFS and again used her expertise to create the new package with Hartford, "for the benefit of her Rhino dealership client, Williams and Simon."

—Thaw admitted that she was the insurance agent for Rhino SFS in January 2001, while employed by HRH, when Rhino SFS renewed the Hartford policy, and that she procured the coverages which Rhino SFS had in effect at the time of the fire.

—The insurance package created by Thaw provided no coverage for workers' compensation, "and no coverage for an employee such as the sprayer who dealt with toxic materials used for lining truck beds. [Williams and Simon] plausibly argued that this policy exclusion would require an experienced broker, with a higher duty of care, to address in presenting the insurance package to a Rhino dealership."

—Williams and Simon "reasonably assumed agent Thaw's expertise and relied on her in the belief they were offered an insurance 'package' tailored for Rhino dealerships."

—The court found the Williamses' evidence—that they never received any advisement from Thaw that they were required to obtain separate workers' compensation insurance and that workers' compensation insurance was not a part of the "package"—more credible than Thaw's contrary testimony that she offered and discussed workers' compensation insurance with Williams in 1999 and his wife in 2000. The court further found it "taxes credibility and plain common sense expectation of business practice under the circumstances, that no written record of even minimum formality exists by agent Thaw documenting considerations, discussions, advisement, or Plaintiffs' alleged declinations relating to workers' compensation insurance for Plaintiffs' Rhino SFS dealership."

—The preponderance of the evidence established that Thaw, while employed by HRH, was negligent "as she failed to use the skill and care that a reasonably careful insurance professional would have used in similar circumstances."

The court also rejected HRH's claim that Williams's failure to read and/or analyze the insurance documents constituted negligence, observing that most

insureds are not actually cognizant of the provisions of their policies, and the insured usually " ' " 'confides implicitly in the agent securing the insurance' " ' " (quoting *Fitzpatrick v. Hayes* (1997) 57 Cal.App.4th 916, 924 [67 Cal.Rptr.2d 445] (*Fitzpatrick*)). The court stated that its analysis of the evidence "does not lead us to assign a reasonably recognizable level of comparative liability to [Williams]." And finally, the court reaffirmed the earlier statute of limitations ruling, concluding that Williams and Simon did not sustain any causally related actual injury or appreciable harm as a result of their lack of workers' compensation insurance until the judgment in the Mann case was entered against them.

Judgment was entered on September 4, 2007, in the amount of $5,829,446.35, plus interest after July 2, 2007 (the date of the court's initial order), and costs. HRH's motion for a new trial was denied, and this appeal followed.

## DISCUSSION

HRH's appeal raises three issues: whether the evidence was sufficient to support the trial court's finding of professional negligence on HRH's part, whether the action was barred as a matter of law by the statute of limitations, and whether the trial court erred as a matter of law in failing to assign any comparative fault to Williams.

> A.   *The evidence amply supported the court's finding that Thaw, when employed by HRH, failed to use the skill and care a reasonably careful insurance professional would have used in similar circumstances.*

■  We begin with a few foundational principles. *Fitzpatrick, supra*, 57 Cal.App.4th 916 summarizes the general rule on insurance agent negligence, which was articulated by Justice Kennard in *Jones v. Grewe* (1987) 189 Cal.App.3d 950, 954–955 [234 Cal.Rptr. 717] (*Jones*). "It is that, as a general proposition, an insurance agent does not have a duty to volunteer to an insured that the latter should procure additional or different insurance coverage." (*Fitzpatrick*, at p. 927, fn. omitted.) Thus, ordinarily the insurance agent's duty is "to use reasonable care, diligence, and judgment in procuring the insurance requested by an insured." (*Jones*, at p. 954.)

"The rule changes, however, when—but only when—one of the following three things happens: (a) the agent misrepresents the nature, extent or scope of the coverage being offered or provided . . . , (b) there is a request or inquiry by the insured for a particular type or extent of coverage . . . , or (c) the agent assumes an additional duty by either express agreement or by 'holding himself

out' as having expertise in a given field of insurance being sought by the insured . . . ." (*Fitzpatrick, supra,* 57 Cal.App.4th at p. 927.) The agent who assumes additional duties, by holding herself out as having expertise in the insurance being sought by the insured, "may be liable to the insured for losses which resulted as a breach of that special duty." (*Jones, supra,* 189 Cal.App.3d at p. 955; see *Fitzpatrick,* at p. 927; *Kurtz, Richards, Wilson & Co. v. Insurance Communicators Marketing Corp.* (1993) 12 Cal.App.4th 1249, 1257, 1255–1257 [16 Cal.Rptr.2d 259] ["[a]t a minimum, an insurance agent has a duty to use reasonable care, diligence, and judgment in procuring the insurance requested by its client" and an agent "may assume additional duties . . . by holding himself or herself out as having specific expertise"; insured stated a cause of action against a broker for negligence, where insured relied on broker's expertise when signing a certificate representing— erroneously—that the company was not subject to certain statutory provisions involving Medicare coverage (leading to the insurer's rescission of the company's group health insurance plan); facts if true would establish a special duty assumed when agents held themselves out as experts on the statute].)[7]

---

[7] *Fitzpatrick* contains a thorough discussion of case authorities applying these principles. (*Fitzpatrick, supra,* 57 Cal.App.4th at pp. 920–927.) In *Fitzpatrick,* the issue was whether the insurance agency had a duty to advise the insureds of the availability of personal umbrella coverage, which would have resulted in their being more adequately compensated for injuries they suffered in an automobile accident. (*Id.* at pp. 918, 920.) The court rejected the contention that the insurer held its agents out as having special expertise in the area of personal insurance needs, thus assuming an additional duty to the insured, finding (among other things) that a brochure (which the insureds never saw) suggesting that the insured ask himself (and then the agent) about additional insurance needs was "far from a 'holding out' of special expertise . . . ." (*Id.* at p. 929.) In *Jones, supra,* 189 Cal.App.3d 950, the court also rejected a claim that a special or greater duty could be inferred from the facts. There, the insureds claimed their agent failed to provide them with liability insurance sufficient to satisfy a $1.5 million judgment entered against them in connection with an injury to a child who fell into a swimming pool at an apartment building they owned. The insureds claimed the agent, who had taken care of their insurance needs for 10 years, represented to them that their insurance protection (a $300,000 liability limit) was adequate, and they relied on the agent's expertise. (*Id.* at p. 953.) The court concluded that the general duty of reasonable care owed by an insurance agent to his client "does not include the obligation to procure a policy affording the client complete liability protection" (*id.* at p. 956), and there were no facts from which a special or greater duty could be inferred: purchasing insurance from an agent for several years and following his advice on certain insurance matters were insufficient to imply the existence of a greater duty, as was the agent's assurance that the policy provided "adequate" coverage. (*Ibid.*) The court observed that ordinarily, the person seeking liability insurance knows better than the insurance agent the extent of his personal assets and the premium he can afford or is willing to pay (*ibid.*); "[n]either an insurance agent nor anyone else has the ability to accurately forecast the upper limit of any damage award in a negligence action against the insured by a third party," and to impose such a duty would "in effect make the agent a blanket insurer for his principal." (*Id.* at p. 957.)

■ In this case, the trial court found that Thaw held herself out as having expertise in the insurance needs of Rhino Linings dealerships, and there was plenty of evidence (described *ante*) to support that finding. Indeed, HRH's own expert testified that Thaw held herself out as having some level of expertise with respect to the insurance needs of Rhino Linings dealerships. And there can be little question that those insurance needs necessarily included coverage for bodily injury to an employee who deals with toxic materials; indeed, the insurance application Thaw provided contained a section on workers' compensation, and Thaw knew that workers' compensation insurance is mandatory in California. Thaw's failure to advise Williams of the necessity for such insurance, and that it was not included in her package for Rhino Linings dealerships, breached the duty she assumed by holding herself out as "the expert on the product necessary to satisfy [Rhino SFS's] insurance needs."

HRH insists that there is "no legal basis" for the trial court's finding that Thaw's expertise created a heightened duty to Williams, because "[a]ny expertise that she possessed did not extend to worker's compensation insurance, which was outside the scope of her alleged expertise concerning the insurance needs of Rhino Linings dealers," and because Williams "never knew about the supposed expertise, and never relied on it." Both arguments are not well founded. The first is contradicted by Thaw's own claims that her staff calculated workers compensation insurance premiums and that she spoke with Williams about such insurance *before* she sent her insurance proposal. The second is contradicted by Williams's testimony, which clearly established both his understanding that Thaw was "the go-to person" for the insurance needs of Rhino Linings dealerships and his reliance on her expertise (because he asked her for "whatever insurance was needed to operate the business" and relied on her to complete his insurance application by selecting the insurance coverages).[8]

HRH makes several other arguments, none of which is meritorious.

First, HRH asserts that Williams is "bound by the terms of the 1999 Travelers insurance policy, since they received and accepted it . . . ." For this

---

[8] Similarly, HRH argues "there were no communications between [Williams and Thaw] that established" that Thaw held herself out as having expertise in a given field of insurance, because Williams testified that he and Thaw never specifically discussed workers' compensation insurance (and indeed "Williams did not even know what worker's compensation insurance was at the time of his 1999 telephone conversations with [Thaw]"). Again, the assumption that Thaw had to hold herself out as an expert in workers' compensation insurance in order to be liable for failing to advise Williams about it is simply wrong. Thaw claimed expertise, in conversations with Williams, in the insurance needs of Rhino dealerships, and those insurance needs necessarily included workers' compensation insurance which is mandatory in California.

proposition, HRH cites *Hadland v. NN Investors Life Ins. Co.* (1994) 24 Cal.App.4th 1578 [30 Cal.Rptr.2d 88] (*Hadland*) and other cases which state the insured has a duty to read his policy, or which recite the general proposition that "a court 'must hold the insured bound by clear and conspicuous provisions in the policy even if evidence suggests that the insured did not read or understand them.' " (*Id.* at p. 1589, quoting *Sarchett v. Blue Shield of California* (1987) 43 Cal.3d 1, 14–15 [233 Cal.Rptr. 76, 729 P.2d 267];[9] see also *Aetna Casualty & Surety Co. v. Richmond* (1977) 76 Cal.App.3d 645, 652 [143 Cal.Rptr. 75] (*Aetna*); *Taff v. Atlas Assur. Co.* (1943) 58 Cal.App.2d 696, 703 [137 P.2d 483] (*Taff*).) None of those cases is apposite, because none concerns the negligence of an insurance agent who has held herself out as having expertise in the area of insurance sought by the insured.[10] (Cf. *Butcher v. Truck Ins. Exchange* (2000) 77 Cal.App.4th 1442, 1463 [92 Cal.Rptr.2d 521] [line of cases such as *Hadland* stating the insured's duty to read the policy did not involve an insured being misled by the negligence of an insurance agent].)

---

[9] Even though the *Sarchett* court recognized the general rule cited in the text, it upheld the trial court's directed verdict on the insured's bad faith claim based on the insurer's failure to advise him of his arbitration rights under the policy: "Once it becomes clear to the insurer that its insured disputes its denial of coverage, however, the duty of good faith does not permit the insurer passively to assume that its insured is aware of his rights under the policy. The insurer must instead take affirmative steps to make sure that the insured is informed of his remedial rights." (*Sarchett v. Blue Shield of California, supra,* 43 Cal.3d at p. 15.)

[10] *Hadland* was a fraud claim against the insurer involving a health insurance policy. The court concluded the insureds' reliance on representations by the defendants of "full protection" under the policy, or of coverage "as good or better" than the insureds' then-current, more expensive policy, was unjustified as a matter of law, because any such representations "were patently at odds with the express provisions of the written contract"; had the plaintiffs read the contract (which contained "unambiguous" maximum benefits of various kinds), they would have discovered the policy's limitations and rejected it. (*Hadland, supra,* 24 Cal.App.4th at pp. 1588–1589.) In *Aetna,* the court recited the " 'general rule that the receipt of a policy and its acceptance by the insured without an objection binds the insured as well as the insurer and he cannot thereafter complain that he did not read it or know its terms. It is a duty of the insured to read his policy.' " (*Aetna, supra,* 76 Cal.App.3d at p. 652.) *Aetna* was a lawsuit between insurer and insured, in which the insurer claimed it had no duty to defend or indemnify the insured against a products liability claim, because the policy excluded such coverage. (*Id.* at pp. 648–649.) The general rule was cited in the context of the appellate court's rejection of the insured's estoppel defense based on his claimed ignorance that his wife, an employee, had instructed Aetna to cancel the products liability coverage, and his failure to read the policy because of the Aetna agent's representations of full coverage, which representations the trial court apparently found had not been made. (*Id.* at p. 652.) *Taff* was a suit by the insured against its insurer for reformation of an insurance contract, on grounds including mutual mistake and fraud by the insurer. Indeed, *Taff* states that "the mere failure to read a policy does not in itself necessarily prohibit a revision of the contract . . . ," and that the failure on the part of a policyholder to read the policy "is a circumstance to be considered by the court on the question of his negligence." (*Taff, supra,* 58 Cal.App.2d at p. 702.) "Unless the policyholder making such excuse gives a satisfactory explanation of his failure to read it, the trial court may be justified in rejecting his excuse and in denying the reformation." (*Ibid.*)

■ The pertinent principle is stated in *Paper Savers, Inc. v. Nacsa* (1996) 51 Cal.App.4th 1090 [59 Cal.Rptr.2d 547] (*Paper Savers*), which involved allegations by the insured (who did not read his insurance policies) that the insurance agent misled him regarding the extent of coverage for losses of business personal property. In reversing summary judgment for the insurer and insurance agent, the court concluded there were genuine issues of triable fact as to whether the agent made the representations and, if so, whether they were sufficient to impose a special duty on the insurer. (*Id.* at p. 1092.) (It will be recalled that an agent's misrepresentation of the nature, extent or scope of coverage being offered or provided is one of the three circumstances in which a heightened duty is imposed on the agent.) The court expressly rejected the contention that the insured's reliance on the agent's alleged representations was unjustifiable as a matter of law because the insured did not read the policy: "[T]he issue whether an insured has a duty to read his policy and whether in not reading his policy he is, nonetheless, bound by its terms, is a complex one and *not one that can be stated baldly without an analysis of the surrounding facts*. In the instant case the same disputed facts return to the forefront to dispose of this issue. *If [the agent] held himself out as an adviser to [the insured] and interpreted the coverage in a way different from what the language of the policy indicated, [the insured] is simply saying that [the agent] may be liable for his negligence, if proved. In this, he is correct*." (*Paper Savers, supra,* 51 Cal.App.4th at p. 1104, italics added.) *Paper Savers* thus emphasized "the principle that language of a policy may *not* control because of an insurer's conduct extrinsic to the contract." (*Paper Savers, supra,* 51 Cal.App.4th at p. 1103; see also *Clement v. Smith* (1993) 16 Cal.App.4th 39, 45 [19 Cal.Rptr.2d 676] [where trial court found that the agent had misrepresented the extent of coverage, "[a]bsent some notice or warning, an insured should be able to rely on an agent's representations of coverage without independently verifying the accuracy of those representations by examining the relevant policy provisions"; this is "particularly true in view of the understandable reluctance of an insured to commence a study of the policy terms where even the courts have recognized that few if any terms of an insurance policy can be clearly and completely understood by persons untrained in insurance law"].)

In short, *Paper Savers* teaches that an insured's failure to read his policy of insurance does not, as HRH would have us believe, render the insured's reliance on the agent's advice unjustifiable as a matter of law. Here, as in *Paper Savers*, there were issues of fact as to whether Thaw held herself out as having expertise in the insurance needs of Rhino Linings dealerships, and whether Williams reasonably relied on that expertise. The trial court determined those facts adversely to HRH.

Next, HRH asserts that even if Thaw and the Robert Driver agency were negligent in January 1999, HRH cannot be charged with liability for that

conduct, and the trial court "erred in imputing the perceived negligent acts and omissions on the part of Ms. Thaw, while she was employed by the Robert Driver agency, to the Timothy Mills agency and [HRH]." But the trial court did *not* impute Thaw's earlier conduct to HRH. The court expressly found that, in January 2000, while employed at HRH, Thaw created a new insurance package for Rhino SFS and again used her expertise to create the new package with Hartford. Nothing had changed in the nature or scope of Thaw's expertise as an agent procuring insurance for Rhino Linings dealerships from 1999 to 2000 or 2001, and nothing had changed in Rhino SFS's insurance needs. Thaw herself admitted that she was Rhino SFS's insurance agent in January 2000, after she began working for HRH. Accordingly, we can discern no error in the court's finding that Williams, in 2001 and 2000 as well as in 1999, "reasonably assumed agent Thaw's expertise and relied on her in the belief they were offered an insurance 'package' tailored for Rhino dealerships." There was no need to (and the trial court did not) impute Thaw's 1999 conduct to HRH; the court found her conduct negligent in both 1999 and 2000.

■ HRH claims that it was not involved in the January 2001 renewal of the Hartford policy in effect at the time of the fire, so it cannot be held liable for the lack of workers' compensation insurance in that policy. HRH cites no authority supporting that proposition, and it defies common sense. Thaw admitted she was Rhino SFS's agent in January 2001; Thaw admitted she procured the coverages that were in effect at the time of the fire (which were unchanged from the January 2000 coverages); and HRH received its commission for the policy. It cannot avoid liability under these circumstances. (Cf. *Clement v. Smith, supra,* 16 Cal.App.4th at p. 46 ["[i]n the absence of later disclaimers an insured can reasonably rely on prior coverage representations by his agent when he or she decides to renew an insurance policy"].)

HRH suggests throughout its brief that the insurance agent's duty is defined by the agent's contractual relationship with the prospective insurance purchaser, that the formation of a contract requires a meeting of the minds, and that there was no meeting of the minds as to the purchase of workers' compensation insurance (because, while Williams may have asked for all the insurance necessary to open his business, the agency "made a counter offer" (the insurance application) which did not include workers' compensation insurance, and that application was binding and Williams "got what [he] had bargained for and what [he] paid for"). In a like vein, HRH argues that in January 2000, Williams received the coverage he asked for, because he requested coverage similar to the existing policy with Travelers, and that is what he got.

We find these arguments unconvincing. The first argument ignores the uncontested fact that Thaw completed the so-called counteroffer to specify

the coverage to be provided, and never faxed back that changed document to Williams. More significant, this is a claim for negligence, not a claim for breach of contract. The insurance agent's duty is clearly defined in *Jones, supra,* 189 Cal.App.3d at page 955, which tells us that an agent who assumes a special duty "may be liable to the insured for losses which resulted as a breach of that special duty."

In sum, there is no merit to HRH's claim that the evidence was insufficient to support the trial court's finding of professional negligence on its part.

### B. *The action was not barred by the statute of limitations.*

HRH contends that Williams's lawsuit is barred as a matter of law by the applicable two-year statute of limitations. (Code Civ. Proc., § 339, subd. 1.) HRH says the statute began to run on July 28, 2001, when employee Mann was seriously injured in the fire, because on that date Williams incurred liability to Mann that was "inescapable," and only the amount of Williams's liability, not the fact of his liability, remained to be determined. HRH is mistaken.

The statute of limitations begins to run "when the cause of action is complete with all of its elements . . . ." (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 397 [87 Cal.Rptr.2d 453, 981 P.2d 79].) The elements of a negligence action include harm or injury. (*Ibid.*; see also *Hydro-Mill Co., Inc. v. Hayward, Tilton & Rolapp Ins. Associates, Inc.* (2004) 115 Cal.App.4th 1145, 1161 [10 Cal.Rptr.3d 582] [" '[a] cause of action for professional negligence does not accrue until the plaintiff (1) sustains damage and (2) discovers, or should discover, the negligence' "].) Thus a cause of action against an insurance broker who negligently secured automobile liability insurance in an amount less than that ordered by the car owner accrued when judgment was entered in a personal injury action in excess of the plaintiff's insurance—*not* when the automobile accident occurred, and not when the personal injury action was filed. (*Walker v. Pacific Indemnity Co.* (1960) 183 Cal.App.2d 513, 514–516 [6 Cal.Rptr. 924] (*Walker*).) At the latter point, the insured "knew only that he was exposed to a liability in excess of [his policy limit]"; while "he had then suffered a loss of security or protection . . . whether that loss would constitute any ultimate injury or damage remained to be determined." (*Id.* at pp. 516–517 ["[w]hether liability would be imposed, and if so, whether it would result in loss by exceeding [the insured's] indemnification, was to be determined by the uncertainties of the personal injury litigation"].)

This case is not significantly different from *Walker.* While Williams became aware of his exposure shortly after the fire, and knew of his potential

liability when Mann filed his lawsuit, no actual injury occurred until judgment was entered against him. As in the *Walker* case, Williams was defended by Hartford throughout the Mann litigation, and he was ultimately indemnified in the amount of the $1 million policy limit. Until judgment was entered against him in excess of that amount, other litigation results were possible: a settlement or verdict under the $1 million policy limit, greater comparative liability on codefendant Rhino USA, or a defense verdict. Thus until the judgment was entered, Williams sustained no appreciable harm from the lack of workers' compensation insurance coverage, and the trial court so found. (See *Walker, supra*, 183 Cal.App.2d at p. 517 ["[i]t is clear that mere possibility, or even probability, that an event causing damage will result from a wrongful act does not render the act actionable . . . ."].)

HRH correctly points out that "it is uncertainty as to the fact of damage, rather than its amount, which negatives the existence of a cause of action . . . ." (*Walker, supra*, 183 Cal.App.2d at p. 517.) But, as in *Walker*, "the fact of any damage at all was completely uncertain until judgment in the personal injury action." (*Ibid.*) HRH insists otherwise, contending that Williams's liability was "inescapable" and "was fixed when their employee was injured, even if the amount of damages was uncertain." HRH's theory seems to be that, because Mann could have brought an action for workers' compensation benefits (regardless of negligence) before the workers' compensation appeals board, in addition to bringing this negligence action, Williams's liability "came into existence at the moment that [Mann] was injured." (See Lab. Code, § 3715 [an employee whose employer has failed to secure the payment of workers' compensation insurance "may, in addition to proceeding against his or her employer by civil action in the courts as provided in Section 3706, file his or her application with the appeals board for compensation"; the appeals board "shall hear and determine the application" and "the employer shall pay the award in the manner and amount fixed" by the board's determination].) But that is not what happened in this case. Mann did not file an application with the Workers' Compensation Appeals Board, and the board made no determination of any such application; there is no basis for HRH's assertion that Williams was "immediately liable to [Mann]" simply because Williams had no workers' compensation insurance.

In short, the trial court did not err. The conclusion cannot be avoided that, on the date of the fire and thereafter until entry of a judgment in excess of the one million dollars in coverage provided by Hartford, the fact of Williams's "ultimate injury or damage remained to be determined." (*Walker, supra*, 183 Cal.App.2d at p. 516.)

C. *The trial court did not err in refusing to assign fault to Williams.*

HRH contends that the trial court's finding that Williams was free from negligence was erroneous, and the case must be remanded for a new trial, because Williams's "negligence was established as a matter of law." This is said to be because (1) Williams violated the Labor Code by failing to carry workers' compensation insurance and, under Evidence Code section 669, a person's negligence "is presumed if that person has violated a statute," and (2) "[i]t is undisputed that [Williams] violated [his] common law duty to read the insurance policies that [he] purchased." Neither argument is meritorious.

■ First, HRH's reading of Evidence Code section 669 is incomplete, to say the least. Under that section, a person's negligence is presumed if he violated a statute *and* the violation "proximately caused death or injury to person or property," *and* the death or injury resulted from an occurrence "of the nature which the statute . . . was designed to prevent," *and* the person suffering the death or injury was one of the class of persons for whose protection the statute was adopted. (Evid. Code, § 669, subd. (a).) Williams's failure to have workers' compensation insurance obviously did not cause any injury to HRH (or to Mann, for that matter), so Evidence Code section 669 has no application in this case.

Second, it was clearly *not* "undisputed" that Williams was negligent in failing to read his policy, and there is no authority for the proposition that an insured's failure to read his policy is negligence as a matter of law. As pointed out above, "the issue whether an insured has a duty to read his policy . . . is . . . not one that can be stated baldly without an analysis of the surrounding facts." (*Paper Savers, supra*, 51 Cal.App.4th at p. 1104; see also *Clement v. Smith, supra*, 16 Cal.App.4th at p. 45 ["an insured should be able to rely on an agent's representations of coverage without independently verifying the accuracy of those representations by examining the relevant policy provisions"]; cf. *Taff, supra*, 58 Cal.App.2d at p. 702 [failure to read a policy "is a circumstance to be considered by the court on the question of his negligence" in a suit to reform the policy].)

In short, findings on questions of fault and comparative fault, including breach of duty, causation and allocation of fault, are, as Williams points out, quintessentially matters of fact. An appellate court has no power to reweigh the evidence, or to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn from the evidence. (*In re Stephen W.* (1990) 221 Cal.App.3d 629, 642 [271 Cal.Rptr. 319].) The trial court was persuaded by its assessment of the

evidence that "a reasonably recognizable level of comparative liability" should not be assigned to Williams, and we have no basis in law upon which to conclude otherwise.

## DISPOSITION

The judgment is affirmed. John Daniel Williams and Steven Stuart Simon are to recover their costs on appeal.

Rubin, Acting P. J., and Bigelow, J., concurred.

A petition for a rehearing was denied October 2, 2009, and appellant's petition for review by the Supreme Court was denied November 19, 2009, S177076.