Filed 4/19/18

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| JOYCE LEDERER et al., | B276266 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC502549) |
| v. | |
| GURSEY SCHNEIDER et al., | |
| Defendants and Respondents. | |

APPEAL from an order of the Superior Court of Los Angeles County, Holly E. Kendig, Judge. Reversed in part, affirmed in part, and remanded with instructions.

Law Offices of Cohen & Marzban, Michael M. Marzban; The Ehrlich Law Firm, Jeffrey I. Ehrlich for Plaintiffs and Appellants.

Chapman Glucksman Dean Roeb & Barger, Randall J. Dean, Ashley H. Verdon; Clark Hill, Neda Cate and David L. Brandon for Defendants and Respondents.

# INTRODUCTION

Plaintiff Joyce Lederer employed accounting firm Gursey Schneider LLP and its employee Spencer Inada (collectively, Gursey) to manage her finances. As part of their agreement, Gursey purchased insurance for Joyce[1] and her family members. Joyce requested that Gursey purchase uninsured/underinsured insurance with a policy limit of $5 million. Gursey actually purchased a policy with a limit of only $1.5 million.

In February 2010, Joyce's adult son, Jonathan Lederer, was in a motorcycle accident that resulted in serious injuries. Shortly afterward, Joyce and Jonathan discovered that the limit on the policy Gursey purchased was only $1.5 million. In January 2012, the insurance company for the other driver involved in the accident tendered the $15,000 limit of the driver's policy to Jonathan. In June 2012, the insurance company tendered the $1.5 million limit of the underinsured motorist policy to Jonathan. In March 2013, Joyce and Jonathan sued Gursey, alleging that they had been damaged because they could not collect the additional money they would have been entitled to had Gursey purchased an insurance policy with the limits Joyce had requested. Jonathan alleged that he was entitled to additional insurance benefits due to his injuries, and Joyce alleged that she was damaged by the diminished benefits because she had to financially support Jonathan.

Gursey moved for summary adjudication, asserting that the lawsuit was untimely. It argued that the cause of action accrued shortly after the accident when plaintiffs discovered that the

---

[1] Because both plaintiffs and one witness share a last name, we refer to them by first name for clarity. No disrespect is intended.

insurance coverage Gursey purchased was less than what Joyce had requested.  Plaintiffs opposed, asserting that even though they discovered Gursey's negligence shortly after the accident, they did not incur actual damages until they collected the insufficient policy benefits.  The trial court agreed with Gursey, and held that plaintiffs' claims were time-barred.  The court also found that Joyce did not show that she was required to financially support Jonathan as a matter of law, and therefore plaintiffs did not demonstrate a triable issue of fact as to Joyce's claim for damages.  The trial court entered judgment for Gursey, and plaintiffs appealed.

We reverse the trial court's order holding that plaintiffs' claims are time-barred.  As the Supreme Court has said, "Only in the unusual case will the [plaintiff] discover . . . negligence without having suffered any consequential damage." (*Budd v. Nixen* (1971) 6 Cal.3d 195, 201.)  This is one of those unusual cases, which distinguishes it from the more common "delayed discovery" scenario in which a plaintiff suffers damages and later discovers the damages were caused by wrongdoing. Here, although plaintiffs were aware of Gursey's alleged negligence shortly after the accident, Jonathan did not suffer actual damages as a result of that negligence until he received a payment of insurance benefits that was less than he would have received in the absence of Gursey's negligence.  Plaintiffs therefore did not incur actual damages until Jonathan became entitled to the benefits of the underinsured motorist policy in June 2012. As a result, plaintiffs' causes of action against Gursey accrued less than two years before they filed this action, and the trial court erred in holding that plaintiffs' claims were time-barred.

We affirm the trial court's ruling that plaintiffs failed to demonstrate a triable issue of fact as to Joyce's legal responsibility for financial support of Jonathan. The evidence showed that Jonathan held the same job both before and after the accident, and therefore plaintiffs failed to demonstrate that Jonathan was incapacitated from earning a living and without sufficient means under Family Code section 3910.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Second Amended Complaint

Plaintiffs alleged in the operative complaint that they employed Gursey and related individuals and entities as financial advisors, bookkeepers, and money managers.[2] They further alleged that they requested and needed an uninsured/underinsured motorist policy with a $5 million policy limit. Instead, Gursey obtained an uninsured/underinsured motorist policy with only a $1.5 million limit.[3] Gursey knew this coverage was insufficient, and should have obtained a uninsured/underinsured motorist policy with a $5 million limit instead. Plaintiffs also alleged that "coverage protection was only for $1,500,000 . . . which was contrary to the directions/instructions/orders of the Plaintiffs," but defendants represented to plaintiffs that insurance coverage totaled $5 million. Plaintiffs alleged that in February 2010, while the $1.5 million policy was in place, Jonathan suffered catastrophic injuries in a motorcycle

---

[2] The complaint named multiple parties as defendants, but only Gursey Schneider LLP and Spencer Inada are respondents on appeal. We therefore do not address plaintiffs' claims as they relate to any other named defendant.

[3] Parts of the complaint alleged that the uninsured/underinsured motorist policy had a $1 million limit. The parties agree that the limit was $1.5 million.

4

accident. The driver of the other vehicle involved had a $15,000 insurance policy limit, which eventually was tendered to Jonathan. Plaintiffs' insurers then agreed to pay the entire limits of the uninsured/underinsured motorist coverage to Jonathan due to the severity and permanence of Jonathan's injuries. Plaintiffs contended they were damaged because Gursey should have purchased a policy with a $5 million limit, and paid that amount to Jonathan. Plaintiffs alleged that because the insurance proceeds did not adequately address Jonathan's expenses, Joyce was required to support Jonathan. Plaintiffs asserted causes of action for negligence, negligent misrepresentation, breach of written contract, breach of oral or implied contract, and breach of fiduciary duty.

## B.    Motion for summary adjudication and court ruling

### 1.    *Motion*

Gursey moved for summary adjudication. It asserted that Joyce testified that before Jonathan's accident, she asked Gursey to secure vehicle insurance coverage for $5 million in case Jonathan injured anyone, and $5 million in case Jonathan was injured. Deposition testimony attached to the motion indicated that both Jonathan and Joyce requested that Gursey obtain at least $5 million in automobile insurance coverage. At the time of the accident, Joyce believed that that she had $5 million in coverage.

Gursey argued that because the basis for plaintiff's claims was accounting malpractice, the two-year statute of limitations in Code of Civil Procedure, section 339, subdivision (1) applied.[4]

---

[4] All further statutory references are to the Code of Civil Procedure unless otherwise indicated. Section 339 states in relevant part, "Within two years: 1. An action upon a contract,

Gursey asserted that plaintiffs' lawsuit, filed in March 2013, was untimely. Gursey said that the statute of limitations began to run on all claims in April 2010, when plaintiffs began exploring insurance issues relating to the accident and discovered that the coverage Gursey purchased had a lower limit than Joyce had requested. Gursey also contended that plaintiffs knew then that the damage from Jonathan's injuries would exceed the amount of all available insurance coverage. In support of this assertion, Gursey cited to a demand letter by Jonathan's counsel to the other driver's insurance company, demanding $10 million to settle Jonathan's claims. Gursey also argued that Jonathan suffered actual injury because he retained an attorney to investigate available insurance coverage and otherwise represent Jonathan's interests with respect to the accident.

Gursey further argued in its motion that there was no triable issue of fact regarding legally recoverable harm to Joyce. It asserted that only Jonathan was injured in the accident, and therefore only Jonathan had a right to the insurance proceeds. Gursey also asserted that although Joyce chose to financially support her adult son following the accident, she did not have a legal obligation to do so. Gursey attached transcripts from

obligation or liability not founded upon an instrument of writing, except as provided in Section 2725 of the Commercial Code or subdivision 2 of Section 337 of this code; or an action founded upon a contract, obligation or liability, evidenced by a certificate, or abstract or guaranty of title of real property, or by a policy of title insurance; provided, that the cause of action upon a contract, obligation or liability evidenced by a certificate, or abstract or guaranty of title of real property or policy of title insurance shall not be deemed to have accrued until the discovery of the loss or damage suffered by the aggrieved party thereunder."

6

Jonathan's deposition, in which he testified that at the time of the accident, he was 29 years old and lived with Joyce. Before the accident, Jonathan always had been financially supported by Joyce or his father, Les Lederer. At the time of the deposition, Jonathan was living in an apartment by himself, and Joyce paid the rent. Jonathan agreed that his sources of financial support had not changed from before the accident to after.

Gursey also asserted that Jonathan was not disabled to the extent that he cannot care for himself, and in fact he "earns an income and is currently employed by his father's law firm . . . to perform computer-related IT services." Gursey attached a transcript of Les's deposition, in which Les testified that before the accident, Jonathan had been employed by his law firm and did work for a retail shopping center Les owns. Les testified that Jonathan is still employed by the firm, but he works reduced hours. Les said that Jonathan does "real work"; his position at the firm was not a "made-up job." Jonathan also testified that he primarily works for his father, and he also does some work for family friends. Jonathan testified that he often works remotely, and he can do much of his work "from home or from anywhere." Jonathan testified that both before and after the accident, the money he earned by working for Les went into an account that Les controlled and Jonathan could not access. Gursey also asserted that Jonathan "has performed other computer work for third parties, as well as drone photography work." Jonathan testified that he drives a car that is not modified to accommodate any disability, and his driver's license carries no restrictions.

2. *Opposition*

Plaintiffs opposed the motion for summary adjudication. Regarding the statute of limitations, plaintiffs pointed out that

7

injuries caused by the vehicle accident should not be conflated with the injury caused by Gursey's negligence. Plaintiffs asserted that they even though they knew of Gursey's wrongdoing in 2010, "mere knowledge of wrongdoing is not damages." Plaintiffs said they did not suffer damages in 2010 by retaining an attorney on Jonathan's behalf relating to the accident, because the firm did not bill for any work relating to the insurance issues with Gursey. Instead, that firm simply investigated the existence of applicable insurance, as it would in any other vehicle accident case. A declaration from Jonathan's attorney stated that neither he nor his firm did any work relating to Gursey's purchase of insurance until the summer of 2012. The attorney researched available insurance following a demand made by Jonathan's passenger on the motorcycle during the accident. The attorney said that the amount of underinsured motorist coverage procured by Gursey had no effect on the work he did before 2012.

Plaintiffs also stated that the timing of Jonathan's underinsured motorist claim was governed by Insurance Code section 11580.2, subdivision (p)(3), which required all third party claims to be exhausted before an underinsured motorist claim could be made to plaintiffs' insurer. Entitlement to underinsured motorist coverage was not a given, because "Jonathan had a heavily disputed motorcycle accident. The police report was against him, as was his passenger who filed a lawsuit against him. As such, he could have gone to trial and been met with a defense verdict. In that event, Jonathan's [underinsured motorist] coverage would have been non-existent." Jonathan's counsel wanted to determine whether the other driver was within the scope of her employment at the time of the accident, in which

case Jonathan may have been entitled to additional insurance. Thus, Jonathan did not accept any settlement money until he received two declarations: "one from the owner of the underinsured motorist vehicle and one from the driver of the underinsured motorist vehicle," in order to ensure that money from the "full maximum insurance available from all policies" had been paid. Plaintiffs asserted that entitlement to the underinsured motorist coverage, if any, began only in January 2012, after those declarations were received and Jonathan had been paid.

Plaintiffs therefore asserted that January 2012 was the earliest their causes of action against Gursey could have accrued. In addition, "the making of a [underinsured motorist] claim does not automatically mean one is entitled to compensation." Instead, the claim was required to be arbitrated or settled. Jonathan's underinsured motorist claim was "concluded on June 22, 2012, for the maximum amount available to him." Plaintiffs argued that because they filed their complaint in March 2013, within two years of exhausting the other available insurance and within two years of completing the underinsured motorist claim, their lawsuit against Gursey was timely.

Plaintiffs also asserted that Gursey was liable for Joyce's out-of-pocket losses for Jonathan's accident-related care because Jonathan was unemployable following the accident. They pointed to Family Code section 3910, subdivision (a), which states that a father and mother have the responsibility to care for a child of any age who is incapacitated from earning a living. Plaintiffs contended there was a triable issue of fact as to whether Jonathan was incapacitated from earning a living.

Plaintiffs argued that Jonathan has never received the money he earned from working with Les, and Joyce had supported Jonathan financially even before the accident. But after the accident, "Jonathan's expenses go beyond his pre-accident living needs." "Whatever work that Jonathan does for his father is his father's way of trying to teach him a lesson," and does not qualify as employment. They asserted that Jonathan is confined to a wheelchair, takes medications that affect his cognition, and suffers from severe depression, anxiety, and extreme pain.

In support of their opposition, plaintiffs attached the declaration of a vocational expert, Paul Broadus, who had analyzed Jonathan's employability. Broadus said that following the accident, Jonathan "was diagnosed with an open book pelvic fracture with avulsion of the nerve roots with neuropathic limb pain. He subsequently underwent multiple surgeries . . . ." Jonathan lost the use of his left leg. He was mostly confined to a wheelchair, and he lived alone but employed an assistant who worked for him 12 hours a day, seven days a week. The assistant did the cooking and cleaning, and assisted with dressing and hygiene. Jonathan continued to suffer from "chronic, severe pain" in his left leg, which "comes repeatedly without warning" as often as "multiple times per day." A nerve blocker had been implanted in Jonathan's brain, which succeeded in reducing the pain by 55-65 percent. Jonathan continued to take pain medications to address pain that is insufficiently managed by the nerve blocker. Severe pain "comes without warning," and when it does, "any useful activity is impossible."

Broadus said that Jonathan was employed at Les's law firm part time, but he "has no set hours, cannot show up if he is in

pain or fatigued, and can work remotely if needed." Other than the work he does for his father, Jonathan "has never been employed and has no other work experience." He had not graduated from college and had no professional certifications. Broadus concluded that although Jonathan had computer skills, his pain episodes made him undependable as a worker, and therefore he was "not employable in the open labor market."

Jonathan also submitted a declaration. He said that the accident left him "depressed, anxious, in extreme pain, grossly overweight, temperamental, mentally erratic," and "physically restricted to a wheelchair." He also said he was unable to drive long distances, and unable to get in and out of a car by himself. He said he could not support himself and relied on his mother for rent, his car, his caregiver, and medical expenses. In a response to a form interrogatory that was submitted with plaintiffs' opposition, Jonathan set out a seven-page list of injuries sustained in the accident, ranging from relatively mild issues such as stiffness, discoloration, and itching, to severe injuries and consequences such as multiple fractures, injury to organs, multiple surgeries, "extreme neuropathic pain," and the inability to walk. Joyce submitted a declaration stating that she pays for Jonathan's rent, car, caretaker, and medical expenses. Plaintiffs submitted portions of Les's deposition, in which he testified that Jonathan uses a wheelchair and cannot walk unassisted.

Jonathan said in his declaration that he works for Les but has never received any money in exchange for that work. Jonathan said that he does not consider the work he does for Les to be real "employment." In his discovery responses, Jonathan said he was not employed at the time of the accident. Les also submitted a declaration stating that Jonathan works for Les's

11

law firm, but Les keeps the money Jonathan earns. Les also said that Jonathan's work at the law firm is "only symbolic," and Jonathan is not a good or reliable worker. Les said he plans to retire within the next couple of years and will not continue to employ Jonathan. Plaintiffs also attached a portion of Jonathan's deposition in which he said that the money he earns working for Les has always been placed in "a separate account for me that just accumulated and he was investing it and stuff, and . . . teaching me to use the stock market and whatnot." Jonathan said that he used the settlement money he received following the accident "for business ventures, but they failed and most of the funds have been depleted."

    3.    *Reply*

In its reply, Gursey repeated many of the arguments from its motion. It also asserted that Jonathan's and Les's declarations should be disregarded because the facts they stated contradicted the testimony in their depositions. Gursey pointed out that Jonathan and Les both said in their depositions that Jonathan worked at Les's law firm before and after the accident, and that Jonathan's pay went into an account that Les managed. Gursey argued that in their declarations submitted with the opposition, Jonathan and Les contradicted this testimony by saying that Jonathan's work was only symbolic and that Jonathan had no entitlement to the money he earned.[5]

    4.    *Hearing and court ruling*

Following a hearing, the court issued a written ruling granting the motion. With respect to the timeliness contentions, the court cited *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103 and

---

[5] Gursey also submitted objections to plaintiffs' evidence, which are not relevant on appeal.

stated that the limitations period begins when a plaintiff suspects injury was caused by wrongdoing.  The court said plaintiffs "had knowledge [of], or at least should have suspected, the negligent conduct a 'couple months' after the accident in February 2010."  The court noted that Joyce said she did not learn of the actual insurance payment until later, and said, "[R]ealizing that the insurance would not pay the $5 million is different from learning a couple of months after the motorcycle accident that Defendant did not get the correct amount of insurance."

The court also said that plaintiffs incurred damages before 2012, because even though Jonathan's attorney said that he did not charge any fees relating to the underinsured motorist coverage before 2012, "the fact that Plaintiffs would incur attorney fees is a sufficient basis to show that Plaintiffs incurred more than nominal damage even if the exact amount of damage of the fees was yet unknown."  Moreover, Joyce incurred damages before 2012 because she had to pay for Jonathan's medical care and other needs following the accident.  The court concluded, "As such, there is no basis to conclude that actual injury did not accrue until the summer of 2012; rather, the evidence shows that actual injury occurred following the accident in February 2010."

The court also said that acceptance of the underinsured motorist settlement was not the event that triggered the statute of limitations:  "[S]imply because Plaintiffs did not accept the $15,000 in UIM [underinsured motorist coverage] until January 2012 does not mean that the Plaintiffs did not suffer injury in fact" before then.  The court also said that because the injury was to Jonathan, rather than a third party, "this action involves a first-party claim where damages could be ascertained once there

13

was a basis to claim damages in excess of $1 million."[6]  Because Jonathan's attorney made a $10 million demand to the other driver involved in the accident in August 2010, "actual damages began almost immediately."  "As such, as early as August 2010, damages could be ascertained once there was a basis to claim damages in excess of $1 million."  The court held that because plaintiffs did not file their complaint until March 2013, their action was time-barred under the applicable two-year statute of limitations.

The court also considered Gursey's argument that there was no triable question of fact about whether Joyce suffered damages because she supported Jonathan financially.  The court stated in its written ruling, "[T]here are insufficient facts to support Plaintiff's claim that Jonathan is incapacitated from earning a living and without sufficient means."  The court pointed to Jonathan's testimony stating that he was employed by Les and occasionally worked for others, and Les's testimony that Jonathan did computer work for Les's law firm.  The court said, "[B]ased on the deposition testimony, it is clear that Plaintiff Jonathan is able to perform work at both his father's law office and at home.  He also received income from drone photography work. . . .  Thus, to the extent the plaintiff claims that he cannot work, such is contradicted by his deposition testimony, and cannot be considered."  The court said that based on Jonathan's admission that he does work, "there is no basis to conclude that he is incapacitated from earning a living and without sufficient

_____

[6] As noted in footnote 3, *ante*, there was some confusion throughout the case as to whether existing coverage was $1 million or $1.5 million.  On appeal, the parties seem to agree that the underinsured motorist coverage totaled $1.5 million.

means." The court therefore granted the motion. Joyce had asserted additional claims unrelated to the issues on appeal, and she dismissed those claims to allow for a judgment and appeal.

Judgment was entered in favor of Gursey. Plaintiffs timely appealed.

## DISCUSSION

"We review the trial court's grant of summary [adjudication] de novo and decide independently whether the parties have met their respective burdens and whether facts not subject to triable dispute warrant judgment for the moving party as a matter of law." (*Jessen v. Mentor Corp.* (2008) 158 Cal.App.4th 1480, 1484.)

## A. Accrual

The parties agree that the two-year statute of limitations in section 339, subdivision (1) applies. The undisputed facts provide the following relevant dates. Jonathan's motorcycle accident occurred in February 2010. Plaintiffs knew sometime in the first half of 2010 that the insurance Gursey purchased for plaintiffs did not include the $5 million policy limit plaintiffs requested. Jonathan settled with the other driver for her $15,000 policy limits, and received that benefit payment in January 2012. Jonathan received the policy limits of the underinsured motorist coverage, $1.5 million, in June 2012. Plaintiffs filed their lawsuit in March 2013. Thus, if plaintiffs' causes of action against Gursey accrued before March 2011 and are not otherwise tolled, they are time-barred.

Because the relevant facts are not in dispute, the application of the statute of limitations may be decided as a question of law. (*Jordache Enterprises, Inc. v. Brobeck, Phleger &*

15

*Harrison* (1998) 18 Cal.4th 739, 764 (*Jordache*); *International Engine Parts, Inc. v. Feddersen & Co.* (1995) 9 Cal.4th 606, 611.

Generally speaking, a cause of action accrues at "'the time when the cause of action is complete with all of its elements.'" (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 806.) Thus, "[t]he statute begins to run when (1) the aggrieved party discovers the negligent conduct causing the loss or damage and (2) the aggrieved party has suffered actual injury as a result of the negligent conduct." (*Apple Valley Unified School Dist. v. Vavrinek, Trine, Day & Co.* (2002) 98 Cal.App.4th 934, 942 (*Apple Valley*).) For purposes of this case, only the second of these two factors is relevant.

It is undisputed that plaintiffs discovered shortly after the accident in 2010 that Gursey had failed to secure the insurance coverage plaintiffs requested. Thus, this case does not involve the delayed discovery doctrine, which makes "accrual of a cause of action contingent on when a party discovered or should have discovered that his or her injury had a wrongful cause." (*Fox v. Ethicon Endo-Surgery, Inc., supra,* 35 Cal.4th at p. 808.) In delayed discovery cases, "plaintiffs are required to conduct a reasonable investigation after becoming aware of an injury, and are charged with knowledge of the information that would have been revealed by such an investigation." (*Ibid.*) Here, the question is when plaintiffs incurred "actual injury"—not when they discovered Gursey's negligence. The trial court erred to the extent that it relied on the delayed discovery doctrine to determine when plaintiffs incurred actual injury.

The Supreme Court in *Budd v. Nixen, supra,* 6 Cal.3d 195 held that actual harm is required before a cause of action accrues: "If the allegedly negligent conduct does not cause damage, it

16

generates no cause of action in tort. [Citation.] The mere breach of a professional duty, causing only nominal damages, speculative harm, or the threat of future harm—not yet realized—does not suffice to create a cause of action for negligence." (*Id*. at p. 200.) In *Adams v. Paul* (1995) 11 Cal.4th 583 (*Adams*), the court said that that "the *fact* of damage rather than the *amount* is the relevant consideration. [Citation.] In addition, the character or quality of the injury must be manifest and palpable." (*Id*. at p. 589.)

Here, Jonathan clearly suffered damages from the motorcycle accident in February 2010, and plaintiffs discovered Gursey's negligence shortly after the accident in early 2010. However, plaintiffs did not suffer the damages alleged to be caused by Gursey—diminished benefits under the underinsured motorist coverage—until Jonathan received that diminished benefit payment in June 2012.

Under relevant statutes and case law, a right to underinsured motorist coverage does not accrue until the insured has reached a settlement or judgment exhausting the underinsured motorist policy. Insurance Code section 11580.2, subdivision (p)(3) (section 11580.2(p)(3)) states that underinsured motorist coverage "does not apply to any bodily injury until the limits of bodily injury liability policies applicable to all insured motor vehicles causing the injury have been exhausted by payment of judgments or settlements, and proof of the payment is submitted to the insurer providing the underinsured motorist coverage."

The Supreme Court discussed this requirement in *Quintano v. Mercury Casualty Co.* (1995) 11 Cal.4th 1049 (*Quintano*), stating, "[S]ection 11580.2(p)(3) establishes a

17

condition precedent to the accrual of the insured's right to coverage." (*Id.* at p. 1057.) The Court continued, "[U]nder section 11580.2(p)(3), the right to coverage under the underinsured motorist policy does not even arise until *after* the tortfeasor's insurer has paid the insured pursuant to a judgment or settlement with the tortfeasor." (*Ibid.*) The Court said that an insured may not make a demand for arbitration to determine coverage before settling with the underinsured motorist, because "the insured's right to claim coverage would not have accrued, so that any demand for arbitration would be premature. Further, as a practical matter, the insurer's liability cannot be determined by arbitration until settlement or judgment against the tortfeasor, as the insurer is only liable for the difference between the amount paid by the tortfeasor or his or her insurer and the insured's policy limits. (§ 11580.2(p)(4), (5).)" (*Id.* at p. 1059.)

Here, Jonathan was not entitled to coverage from the underinsured motorist policy until after he settled with the other driver's insurance in January 2012. Gursey argued that Jonathan suffered actual injury when he "sustained severe bodily injuries exceeding his available insurance coverage, without any right to obtain any greater liability protection to fully compensate him for his injuries." Gursey asserts that this "diminution of a right" constitutes actual damages. We are not persuaded that Jonathan could be damaged by the allegedly inadequate limit of the underinsured motorist policy before the right to receive *any* coverage under that policy had accrued. As the Court said in *Adams*, "'The mere breach of a professional duty, causing only . . . the threat of future harm—not yet realized—does not suffice'" to constitute actual harm. (*Adams, supra*, 11 Cal.4th at p. 589.)

Jonathan's harm was not yet realized before he had a right to the benefits of the underinsured motorist policy.

Plaintiffs assert that this case is similar to *Williams v. Hilb, Rogal & Hobbs Ins. Services of California, Inc.* (2009) 177 Cal.App.4th 624. We agree. In that case, a company bought an insurance package that its insurance agency specifically designed for the company. (*Id.* at pp. 628-629.) After a worker was injured in a fire, the company owners discovered that the insurance package they purchased included a $1 million general commercial liability policy, but did not include any workers' compensation insurance. The employee sued, and a jury found the company liable. (*Id.* at p. 629-630.) The company then sued the insurance agency, HRH, which asserted that the statute of limitations barred the action. HRH argued that the statute of limitations began to run on the date the employee was injured, because on that date the company knew that liability was "inescapable," and only the amount of the liability, not the fact of liability, remained to be determined. (*Id.* at p. 641.)

The Court of Appeal held that the company did not incur actual injury until judgment was rendered in the employee's lawsuit. Although the company knew of potential liability when the employee was injured, "no actual injury occurred until judgment was entered" against the company that exceeded the general liability policy. (*Williams, supra*, 177 Cal.App.4th at pp. 641-642.) "Until judgment was entered against [the company] in excess of that amount, other litigation results were possible: a settlement or verdict under the $1 million policy limit, greater comparative liability on codefendant Rhino USA, or a defense verdict. Thus until the judgment was entered, [the company]

19

sustained no appreciable harm from the lack of workers compensation insurance coverage." (*Id*. at p. 642.)

The *Williams* court relied on *Walker v. Pacific Indem. Co.* (1960) 183 Cal.App.2d 513, which presented similar facts. There, a logging truck owner requested that his insurance broker secure a policy with a $50,000 bodily injury limit. The broker secured a policy with only a $15,000 limit. (*Id*. at p. 515.) The truck was in an accident, and a jury returned a verdict for the other driver in the amount of $100,000. (*Ibid*.) The truck owner assigned his rights under the policy to the other driver, and she sued the insurance company and broker. (*Ibid*.) The broker demurred, arguing that the claim was time-barred because it accrued at the latest on the date of the accident. The plaintiff argued that the cause of action accrued when the judgment was entered. (*Ibid*.)

The Court of Appeal said, "There is no dispute that the wrong here occurred March 17, 1952, when defendant 'negligently and carelessly' procured a policy with limits of $15,000, rather than $50,000." (*Walker, supra*, 183 Cal.App.2d at pp. 515-516.) The court continued, "But was there any injury or damage then? We think not. . . . Until an accident occurred, bodily injury was inflicted on another, and a liability in excess of the $15,000 coverage incurred, there was no injury to [the truck owner] in the absence of possible special facts which do not appear here." (*Id*. at p. 516.)

The reasoning of *Williams* and *Walker* applies here, because the fact of the defendants' negligence became known to the plaintiffs before the plaintiffs incurred any damages resulting from that negligence. These cases can be distinguished from cases in which a plaintiff suffers damages, and later discovers negligence caused those damages.

For example, Gursey asserts that this case is similar to *Jordache, supra*, 18 Cal.4th 739. In that case, Jordache retained a law firm, Brobeck, to represent it in a lawsuit in which Jordache had been named as a defendant. Brobeck did not give Jordache any advice about potential liability insurance coverage, and neither Jordache nor Brobeck informed Jordache's insurer of the lawsuit. Two and a half years later, Jordache retained new counsel who told Jordache there was potential insurance coverage for the lawsuit. By December 1987, "Jordache had discovered Brobeck's alleged negligence in not notifying or advising Jordache to notify its insurers" of the lawsuit. (*Id*. at p. 745.)

Jordache tendered the defense of the lawsuit to its insurers, which apparently denied the claim; "in February 1988, Jordache sued its insurers, alleging they failed to provide a defense and wrongfully refused to acknowledge coverage." (*Jordache, supra*, 18 Cal.4th at p. 745.) In May 1990, the original lawsuit against Jordache settled. (*Id*. at p. 746.) In July 1990, "Jordache settled its insurance coverage suits for $12.5 million." (*Id*. at p. 746.)

Jordache then sued Brobeck in February 1991,[7] alleging that Brobeck failed to investigate possible insurance coverage and failed to advise Jordache to report the litigation to its insurers. Brobeck moved for summary judgment on the grounds that Jordache knew of the alleged negligence and suffered actual injury in 1987, and therefore its claim was time-barred. Jordache

---

[7] Jordache's lawsuit against the attorney was filed in February 1991, but pursuant to a tolling agreement, it was deemed filed as of August 1990. (*Jordache, supra*, 18 Cal.4th at p. 746.)

21

argued that it did not suffer actual injury until it settled with its insurer for less than the full amount of its claim in July 1990. (*Jordache, supra*, 18 Cal.4th at p. 746.)

The Supreme Court said, "'The mere breach of a professional duty, causing only nominal damages, speculative harm, or the threat of future harm—not yet realized—does not suffice to create a cause of action for negligence. [Citations.] Hence, until the client suffers appreciable harm as a consequence of [the] attorney's negligence, the client cannot establish a cause of action for malpractice.'" (*Jordache, supra*, 18 Cal.4th at p. 750.) The Court held that Jordache already had suffered actual injury by the time it learned of Brobeck's negligence in 1987, because it had been paying for defense counsel who otherwise might have been covered by insurance: "By then, Jordache had lost millions of dollars—both in unpaid insurance benefits for defense costs in the [original] action and in lost profits from diversion of investment funds to pay these defense costs. As Brobeck asserts, these damages were sufficiently manifest, nonspeculative, and mature that Jordache tried to recover them as damages in its insurance coverage suits." (*Jordache, supra*, 18 Cal.4th at p. 752.)

The Court also said that "Jordache's injuries were not speculative or contingent until the trial court ruled the insurers had a duty to defend Jordache and Jordache settled its coverage claims. [S]peculative and contingent injuries are those that do not yet exist, as when an attorney's error creates only a potential for harm in the future. [Citations.] An existing injury is not contingent or speculative simply because future events may affect its permanency or the amount of monetary damages eventually incurred. [Citations.]." (*Id*. at p. 754.) The Court added,

22

"Delaying recognition of actual injury until related litigation concludes would give a client who has sustained actionable damages, and who is aware of the attorney's error unilateral control over the limitations period. This result would undermine the Legislature's purpose in enacting a statute of limitations. (*Id.* at p. 755.)

Because Jordache alleged that it was entitled to insurance coverage at the initiation of the original lawsuit filed against it, Jordache began to incur actual damages when it began to pay for the costs that otherwise would have been covered by insurance. By the time it discovered Brobeck's negligence, Jordache already had incurred damages. The record does not demonstrate that the same is true here. Rather, because the insurance coverage at issue is underinsured motorist coverage, and Jonathan's right to that coverage did not accrue until 2012 due to statutory restrictions, Jonathan's actual injury did not occur until he received the limited benefits payment of $1.5 million.

Gursey asserts that Jonathan was damaged not only by receipt of the diminished limits of the underinsured motorist policy in June 2012, but also "because his attorneys had to spend time to investigate his coverage, and Joyce sustained damages because she started paying for Jonathan's expenses" before Jonathan collected any insurance benefits. Gursey compares this case to *Apple Valley, supra,* 98 Cal.App.4th 934. That case, like *Jordache*, involves delayed discovery of wrongdoing after damages already had been incurred, rather than a delay in actual injury.

In *Apple Valley*, a public school district hired an accounting firm to analyze the policies of a charter school and audit the school's finances. (*Id.* at p. 938.) The firm issued a report

23

regarding finances and attendance for part of the school, but omitted information about associated "satellite" schools that charged tuition and taught religion—practices that violated state and federal law. (*Id*. at p. 939.) The district later learned of the violations and revoked the school's charter; a subsequent audit revealed that the charter school had received $4.4 million more in funding than it was entitled to receive. (*Id*. at pp. 939-940.) The district then sued the accounting firm, alleging that its false representations about the school led to the improper issuance of funds to the school. (*Id*. at p. 940.)

The firm asserted that the district's claim was time-barred because the district knew of possible wrongdoing at the school and had suffered damages more than two years before it sued the accounting firm. (*Apple Valley, supra,* 98 Cal.App.4th at p. 942.) The district countered that it had not suffered damages until an audit report stated that the district was responsible for the improper payments to the charter school, because before then, damages were speculative. (*Id*. at p. 944.) The Court of Appeal agreed with the accounting firm. It held that the district suffered actual injury when it provided funds to the charter school based on the defendant firm's misrepresentations, or "after it suspected the error and suffered out-of-pocket losses by paying investigation and legal fees in an effort to determine the extent of the improper payments. In either case, the statute of limitations lapsed." (*Id*. at p. 947.)

The *Apple Valley* court discussed *Jordache*, and noted that according to that opinion, legal fees and investigation costs incurred as the direct result of another's tort constitute recoverable damages. (*Apple Valley, supra,* 98 Cal.App.4th at p. 948.) The court said, "[T]herefore, the out-of-pocket expenses the

24

District incurred when it engaged its accountant and legal counsel, in an effort to determine the extent of the improper payments and arrange for reimbursement of funds improperly received, constituted actual injury for limitations purposes." (*Id.* at p. 949.) The court also said that later events that might alter the district's financial responsibility did not change the accrual date: "That the District may ultimately avoid liability for the improper payments through its pending appeal does not mean it did not suffer injury." (*Id.* at p. 951.)

Gursey asserts that here, plaintiffs incurred damages when they began to investigate the scope of insurance coverage. However, there is no indication that recovery of attorney fees is appropriate in the context of this case. Attorney fees are not typically recoverable in the absence of an agreement between the parties. (See § 1021.) There is an exception, where "a person who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person." (*Prentice v. North Am. Title Guaranty Corp., Alameda Division* (1963) 59 Cal.2d 618, 620.) In *Jordache*, for example, Jordache incurred legal fees as a result of Brobeck's negligence because it had to defend itself in the original litigation. In such cases, "attorney's fees . . . are recoverable as damages resulting from a tort in the same way that medical fees would be part of the damages in a personal injury action." (*Brandt v. Superior Court* (1985) 37 Cal.3d 813, 817.) As *Apple Valley* noted, investigation costs incurred as a direct result of another's tort can also be deemed recoverable damages. (*Apple Valley, supra*, 98 Cal.App.4th at pp. 948-949; see also *Stearman v. Centex Homes* (2000) 78 Cal.App.4th 611, 625 [in a construction defect case, fees were recoverable where "plaintiffs

25

were billed $37,500 by professionals who investigated the problems in order to formulate an appropriate repair plan."].) This "so-called 'third party tort exception' to the rule that parties bear their own attorney fees is not really an 'exception' at all but an application of the usual measure of tort damages. . . . In such cases there is no recovery of attorney fees qua attorney fees." (*Sooy v. Peter* (1990) 220 Cal.App.3d 1305, 1310.)

Here, there is no indication that the third-party tort exemption applies. The evidence does not suggest that plaintiffs employed counsel to do anything more than represent Jonathan in relationship to the accident—which presumably would have occurred even if the underinsured policy limits were higher—and to represent them in this case. Gursey does not assert that plaintiffs had to defend a separate lawsuit as a result of defendants' negligence or incur investigation costs other than typical litigation discovery. Indeed, the evidence is to the contrary. Jonathan's attorney stated in his declaration that he investigated the scope of available insurance while defending Jonathan against a claim made by Jonathan's passenger, which he would have done in any personal injury case. The attorney made clear that he did not investigate anything relating to Gursey's negligence until the summer of 2012. Moreover, plaintiffs' second amended complaint did not request attorney fees or investigation costs as recoverable damages. Thus, Gursey's argument that its negligence caused plaintiffs to incur recoverable damages in the form of attorney fees before June 2012 is not supported by the evidence or the law.

In holding that plaintiffs incurred damages before 2012, the trial court also relied on Joyce's declaration stating that she paid for Jonathan's immediate medical bills, caretaker, and other

26

needs after the accident, and said this "shows that actual injury occurred following the accident in February 2010." The court's conclusion conflates the injuries caused by the accident with the injuries allegedly caused by Gursey's negligence. As discussed above, Jonathan was not entitled to the benefits of the underinsured policy coverage until after he settled his claim against the other driver in January 2012. Jonathan (and presumably, Joyce) would have incurred costs for Jonathan's medical care and living expenses from the time of the accident until Jonathan collected the underinsured motorist policy benefits, no matter what the limits on the policy were. In other words, Gursey's negligence—purchasing a $1.5 million policy versus a $5 million policy—had no effect on Jonathan's medical or living expenses from the time of the accident in February 2010 until the time Jonathan became entitled to underinsured motorist policy benefits in June 2012. Jonathan's entitlement to eventual *reimbursement* of medical and living expenses through the underinsured motorist policy is not tantamount to those expenses being *caused* by Gursey's negligence in the first instance. Thus, the fact that Jonathan and Joyce incurred those expenses following the motorcycle accident does not warrant a finding that Jonathan's causes of action against Gursey accrued before June 2012.

In addition, as plaintiffs point out, until Jonathan received the benefit payment from the underinsured motorist policy, his damages remained speculative. It was not clear that Jonathan would suffer damages resulting from Gursey's negligence until a finding was made that he was entitled to the upper limit of the underinsured motorist coverage. By statute, the amount of recovery under an underinsured motorist policy is to be

determined by agreement between the insured and the insurer, or if the parties do not agree, by arbitration. (Ins. Code, § 11580.2, subd. (f); see also *Bouton v. USAA Cas. Ins. Co.* (2008) 43 Cal.4th 1190, 1193 ("if the insurer and the insured cannot agree whether the insured is legally entitled to recover damages from an uninsured motorist and the amount of such damages, those issues shall be determined by arbitration.").) In addition, if any other party is deemed liable for the injuries, the underinsured motorist insurance coverage may be reduced. (See, e.g., Ins. Code, § 11580.2, subd. (p)(4); *Mercury Ins. Co. v. Vanwanseele-Walker* (1996) 41 Cal.App.4th 1093, 1103 [car manufacturer that settled product liability claims relating to a car accident was an organization legally liable for the injury, and therefore recovery under the underinsured motorist policy should have been reduced].)

Here, the parties seem to agree that Jonathan's damages exceeded $1.5 million. However, liability for the damages was contested, and as plaintiffs point out, "if [the insurer] had been able to convince the arbitrator that Jonathan bore the brunt of the fault for causing the accident, the arbitration award could have been for $1.5 million or less." If that were the case, Jonathan would not have been entitled to more than $1.5 million in underinsured motorist coverage, and Gursey's negligence in purchasing a lower-limit policy would not have caused plaintiffs any harm.

Gursey asserts that the Supreme Court rejected a similar argument in *Jordache*. There, the Court stated, "There is no requirement that an adjudication or settlement must first confirm a causal nexus between the attorney's error and the asserted injury." (*Jordache, supra*, 18 Cal.4th at p. 752.) The

28

Court continued, "[T]he result of Jordache's coverage litigation could only confirm, but not create, Jordache's actual injuries from the late tender of the [litigation] defense. Jordache's right to an insurer-funded defense existed or not when that action first embroiled Jordache. The right to that insurance benefit, the impairment of that right, and Jordache's expenditures while that right was unavailable, did not arise for the first time when Jordache settled with the insurers." (*Id*. at p. 753.)

This passage from *Jordache* highlights the contrast between these two cases. There, Jordache allegedly had a right to insurance coverage from the beginning of the original litigation against it. Here, Jonathan did *not* have a right to claim underinsured motorist insurance coverage until after his claim against the other driver was settled in January 2012. Jonathan could not incur actual injury from the inadequate insurance policy before he was entitled to receive the benefits of the insurance policy.

Gursey also asserts that *Jordache* bars plaintiffs' claims because that case warned against "a general rule that tolls the limitations period until a related lawsuit establishes a causal connection between attorney error and resulting injury." (*Jordache, supra*, 18 Cal.4th at p. 754.) The court said, "[A] prospective malpractice plaintiff could influence the course of the collateral suit and the timing of its conclusion. . . . Delaying recognition of actual injury until related litigation concludes would give a client who has sustained actionable damages, and who is aware of the attorney's error, unilateral control over the limitations period. This result would undermine the Legislature's purpose in enacting a statute of limitations." (*Id*. at p. 755.)

29

Gursey argues that the same reasoning applies here: "To hold that [plaintiffs'] damages did not arise until Jonathan settled his claims gives [plaintiffs] 'unilateral control' over the limitations period, because they decided when to file their claim against [the other driver], when to demand her policy limits, what conditions to place on her acceptance, when to file the UIM claim and when to demand the UIM limits. . . . In fact, it was [plaintiffs] who delayed the resolution of that claim by conditioning settlement on the other driver providing a declaration proving there were no other possible sources of recovery, and then waiting for that declaration for a year and a half while offering no evidence explaining or justifying the delay. Similarly, it was [plaintiffs] who decided when to bring the underinsured motorist claim and when to demand the underinsured motorist policy limits from the insurance carrier."

As the Supreme Court in *Quintano* acknowledged, some delay is inherent in underinsured motorist claims: "[S]ettlement with the tortfeasor's insurer may take close to a year even when the insured assiduously pursues settlement" (*Quintano, supra*, 11 Cal.4th at p. 1057), and "even if the insured makes a timely claim against the tortfeasor's insurer, that insurer may agree to a settlement but delay payment for a period beyond a year past the date of the accident." (*Id*. at p. 1058.) However, the court said that delay is warranted because determination of the tortfeasor's liability is critical to the determination of liability under the underinsured motorist policy: "By statute, the underinsured motorist insurer owes nothing until satisfaction of judgment or settlement against the tortfeasor, and is entitled to a credit for any amount the insured received from the tortfeasor. (§ 11580.2(p)(3), (5).) The insurer can never be liable for more

30

than the tortfeasor's liability.  (*Ibid*.)"  (*Id*. at p. 1061.)  The court stated that delay was not a significant concern:  "[A]s a practical matter, we think it unlikely the insured who chooses to settle with the tortfeasor will delay making a claim on the insurer any longer than the insured who chooses to sue the tortfeasor.  To make a claim, after all, is the only way to receive full compensation under the underinsured motorist policy.  Nor does it seem likely the insured will delay concluding a judgment or settlement with the tortfeasor's insurer, for the same reason."  (*Id*. at p. 1064.)

Here, the delay does not warrant a holding that Jonathan incurred actual injury before his right to the benefits of the underinsured motorist policy was determined.  Gursey has not presented any evidence to suggest that Jonathan influenced the timing of the underinsured motorist's insurance payment.  Moreover, Gursey has not demonstrated that it was prejudiced by the delay.  Standing alone, the fact that underlying litigation was required to determine whether Jonathan would incur damages does not render his claim for those damages untimely.

In summary, our holding is as follows.  A cause of action accrues when it is complete with all of its elements.  Damages is an element of the torts alleged in this case.  Jonathan did not incur actual damages arising from Gursey's negligence until June 2012, when he recovered $1.5 million from the underinsured motorist policy instead of the higher amount he allegedly would have received in the absence of Gursey's negligence.  Jonathan's causes of action against Gursey therefore did not accrue until June 2012.  The trial court erred by granting summary adjudication on the basis that plaintiffs' causes of action were time-barred.

31

**B. Liability to Joyce based on Family Code section 3910**

Plaintiffs also assert that the trial court erred in finding that there was no triable issue as to Joyce's alleged damages. Plaintiffs alleged that Joyce incurred damages because she has an obligation to support Jonathan under Family Code section 3910, subdivision (a), which states in full, "The father and mother have an equal responsibility to maintain, to the extent of their ability, a child of whatever age who is incapacitated from earning a living and without sufficient means."[8] An adult child is deemed incapacitated from earning a living within the meaning of Family Code section 3910 "if he or she demonstrates 'an inability to be self-supporting because of a mental or physical disability or proof of inability to find work because of factors beyond the child's control.'" (*In re Marriage of Cecilia and David W.* (2015) 241 Cal.App.4th 1277, 1285.) "[T]he question of 'sufficient means' should be resolved in terms of the likelihood a child will become a public charge." (*In re Marriage of Drake* (1997) 53 Cal.App.4th 1139, 1154.)

The trial court granted Gursey's motion for summary adjudication on this issue, finding that "there are insufficient

---

[8] It is not clear that this statute provides an appropriate basis upon which a parent may establish liability against a third party. (See, e.g., *In re Marriage of Drake* (1997) 53 Cal.App.4th 1139, 1152 ["[A] parent's statutory duty to support an incapacitated adult child runs to the child [citations], although this duty may be enforced by an action initiated by the other parent."].) The parties do not address the applicability of this statute to the facts of this case, however. Thus, we assume without deciding that Gursey could be liable if plaintiffs could make a showing that Jonathan was incapacitated and without means under this statute.

facts to support Plaintiff's claim that Jonathan is incapacitated from earning a living and without sufficient means." The court said, "[I]t is clear that Jonathan is able to perform work at both his father's law office and at home," and he also received income from other work. The court found that Jonathan had "admitted that he was able to work," warranting summary adjudication of this issue.

Plaintiffs assert that the court erred because it "went far beyond determining whether there was a triable issue of fact concerning the extent of Jonathan's incapacity," and instead "improperly resolved those disputed issues in favor of Gursey." "[T]he court's sole function on a motion for summary judgment is to determine from the submitted evidence whether there is a 'triable issue as to any material fact' (§ 437c, subd. (c))." (*Zavala v. Arce* (1997) 58 Cal.App.4th 915, 926.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.) The question here, therefore, is whether the evidence would allow a reasonable trier of fact to find that Jonathan is "incapacitated from earning a living and without sufficient means."

The evidence shows that both before and after the accident, Jonathan was employed at Les's law firm doing computer work. In his deposition, Les said that Jonathan does "real work"; his position at the firm was not a "made-up job." Jonathan testified that he works for Les and also does some work for family friends. Jonathan testified that both before and after the accident, the money he earned by working for Les went into an account that

33

Les controlled, and the money was invested and used to teach Jonathan how to invest in stocks.

In opposition to the motion, plaintiffs submitted declarations that contradicted the deposition testimony. For example, Jonathan testified that Les deposited Jonathan's pay "in a separate account for me that just accumulated and [Les] was investing it," but in his declaration he said that Les used Jonathan's pay to reimburse debts Jonathan owes to Les. Les also contradicted his deposition testimony, because at his deposition he testified that Jonathan does "real work" at his law firm, but in his declaration he said that Jonathan's employment is "only symbolic." As the court correctly noted, "a party cannot create an issue of fact by a declaration which contradicts his prior discovery responses." (*Shin v. Ahn* (2007) 42 Cal.4th 482, 500 fn. 12.)

Plaintiffs assert that a triable issue of fact was demonstrated by vocational expert Paul Broadus's conclusion that Jonathan is "not employable in the open labor market" and Joyce's declaration that before the accident, she did not plan to continue supporting Jonathan. However, when there is a dispute over the child's capacity, "the incapacity standards require courts to focus not on the adult child's conditions and their potential impact on employment, but rather on his or her ability to find work or become self-supporting in light of such conditions." (*In re Marriage of Cecilia and David W.*, *supra*, 241 Cal.App.4th at p. 1286.) Here, Jonathan did find work—the very same work he was doing before the accident. At his deposition, counsel asked Jonathan, "[T]he method of support of yourself hasn't changed from before the accident; is that right?" Jonathan answered, "That's right." The trial court did not err by finding that

34

plaintiffs failed to demonstrate a triable issue of fact as to Jonathan's incapacity and lack of means under Family Code section 3910.[9]

## DISPOSITION

The judgment is reversed in part and affirmed in part. On remand, the trial court shall vacate its order granting summary adjudication of plaintiffs' claims, and enter a new order denying the motion as to the statute of limitations, and granting the motion as to Joyce's damages based on Family Code section 3910. The parties shall bear their own costs on appeal.

## CERTIFIED FOR PUBLICATION

COLLINS, J.

We concur:

EPSTEIN, P. J.

WILLHITE, J.

---

[9] Our finding that plaintiffs failed to demonstrate a triable issue of fact under the particular requirements of Family Code section 3910 is limited to this specific issue, and should not be construed as relating to Jonathan's capacity or employability in any other aspect of the case.