Filed 10/05/20 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DAVID MURRAY,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>UPS CAPITAL INSURANCE AGENCY,<br>INC,<br><br>    Defendant and Respondent. | G058353<br><br>(Super. Ct. No. 30-2018-00997998)<br><br>ORDER MODIFYING OPINION;<br>REQUEST FOR REHEARING<br>DENIED; NO CHANGE IN<br>JUDGMENT |

It is ordered that the opinion filed herein on September 11, 2020, be modified as follows:

(1)  At the top of page 2, in the first sentence the word "Postal" will be deleted and replaced with the word "Parcel"; and

(2)  At the bottom of page 26, in the last sentence the word "presumption" will be deleted and replaced with the words "reasonable inference."

This modification does not change the judgment.

The petition for rehearing is denied.

O'LEARY, P. J.

WE CONCUR:

BEDSWORTH, J.

GOETHALS, J.

Filed 9/11/20 (unmodified opinion)

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DAVID MURRAY, | |
| Plaintiff and Appellant, | G058353 |
| v. | (Super. Ct. No. 30-2018-00997998) |
| UPS CAPITAL INSURANCE AGENCY, INC, | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, Gregory H. Lewis, Judge. Reversed and remanded.

Miles L. Kavaller APC and Miles L. Kavaller for Plaintiff and Appellant.

Countryman & McDaniel, Michael S. McDaniel, Christoph M. Wahner, and Mark P. Estrella for Defendant and Respondent.

David Murray purchased used computer equipment worth nearly $40,000, which was damaged by the United Postal Service (UPS) while it was being transported from California to Texas. Murray believed he purchased appropriate insurance to cover this loss, but the insurance company denied his claim. Murray sued his insurance broker, UPS Capital Insurance Agency (UPS Capital), for breach of contract and negligence. He asserted UPS Capital owed him a special duty to make the insurance policy language understandable to an ordinary person and to explain the scope of coverage. The court granted UPS Capital's motion for summary judgment after concluding there was no heightened duty of care and dismissed Murray's lawsuit.

On appeal, Murray asks us to create a new rule that brokers/agents, specializing in a specific field of insurance, hold themselves out as experts, and are subject to a heightened duty of care towards clients seeking that particular kind of insurance. We decline the invitation to create a per se rule, however, we conclude Murray raised triable issues of fact as to whether UPS Capital undertook a special duty by holding itself out as having expertise in inland marine insurance, and Murray reasonably relied on its expertise. We reverse the judgment and remand the matter for further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

The parties do not dispute the following facts alleged in Murray's complaint. In March 2018, Murray purchased computer equipment in California and arranged for it to be transported to Texas. Murray saw on UPS's Web site that its liability is limited to $100 on packages with no declared value. Liability increased if the customer declared a higher value (up to $50,000 per package) and paid an additional charge. UPS advised Murray not to declare a higher value, but rather contact its sister company, UPS Capital, to purchase insurance coverage.

Murray contacted UPS Capital and requested insurance coverage for a shipment that same day from California to Texas. He completed UPS Capital's form

2

application for a "house policy coverage" and paid $350.  On the form, Murray described the shipment as used computer equipment valued at $37,000.  That same day, Tokio Marine America Insurance Company (Tokio) issued a "Marine Certificate of Insurance" (Certificate), which Murray believed fully insured the shipment in the event of any loss or damage by UPS.

The Certificate contained a Free From Particular Average (FPA) provision, providing the following limitation on coverage:  "Warranted free from Particular Average unless the vessel or craft be stranded, sunk or burnt, but notwithstanding this warranty Underwriters are to pay any loss or damage to the interest insured which may reasonably be attributed to fire, collision or contact of the vessel and/or conveyance with any external substance (ice included) other than water, or to discharge of cargo at port of distress; and also to pay the insured value of any merchandise and/or goods jettisoned and/or washed or lost overboard, and the risks of theft of or non-delivery of an entire shipping package."

The computer equipment was packaged on a cart with wheels and shrink wrapped.  At some point during the shipment to Texas, UPS damaged the equipment and Murray submitted a $36,666.85 claim.  Tokio informed Murray it assigned a surveyor to inspect the damaged shipment and prepare a report.  Tokio rejected the claim on the grounds the coverage Murray purchased did not cover the loss.  Specifically, the Certificate's FPA provision did not apply to the shipping damages.  Murray later learned the policy "covered only catastrophic losses such as the entire destruction of the vehicle in which the shipment was carried by UPS and not damage caused by factors other than a catastrophic loss such as mishandling the freight or other causes."

Murray sued UPS Capital for breach of contract on the grounds it sold Murray "an insurance product that did not cover the risks of damage to cargo in the ordinary course or truck transport where there was no catastrophic loss."  His negligence claim was based on the premise UPS Capital owed a special duty "to the public and to

3

[Murray] . . . to exercise reasonable care in its dealings including a duty of disclosure to inform Murray of the products available to cover in transit cargo loss and damage in the absence of a catastrophic loss and further to fully explain technical provisions such as the 'FPA' [provision]." Murray also asserted UPS Capital owed a "duty of good faith and fair dealing to its customers to give at least as much consideration to the insured's interests as it does to its own." He maintained UPS Capital breached its duty of care by "failing to fully explain the FPA provision in the [Certificate], not disclosing other available insurance products to Murray[,] and not giving Murray the opportunity to purchase insurance that would cover loss or damage caused by factors other than a catastrophic loss."

I. *Summary Judgment Motion*

UPS Capital filed a motion for summary judgment. It set forth the following material facts. Murray completed and submitted a form application for "House Policy Coverage" describing the shipment as being for "used" computer equipment. The first page of the application form contained the following language: "Used items will not be insured 'All-Risk.'" In its motion, UPS Capital explained the term "All-Risk" was "the broadest form of cargo insurance policy," which insured "cargo in the event of physical loss or damage from any external cause subject to exclusions of specific risks. [Citations.]"

UPS Capital maintained that after receiving Murray's application form, it requested additional information from him. Because Murray described the shipment as containing used computer equipment, UPS Capital included in its e-mail the following statement: "FYI: We abide by FPA coverage guidelines for used goods." The e-mail also restated the FPA provision quoted earlier in this opinion.

In its summary judgment motion, UPS Capital explained an FPA provision provided "limited coverage that usually applies to used and certain other categories of goods." It clarified this type of coverage "insures cargo only for the risk of total loss

4

(such as theft), thereby eliminating an insurer's liability for partial losses except in the event of specifically named catastrophic perils. [Citation.]"

UPS Capital noted Murray's initial request for insurance, submission of the application, premium payment, and issuance of the Tokio Certificate, all took place on the same day UPS began transporting the computer equipment. It stated the Certificate clearly contained the FPA provision (using the language previously described in this opinion). UPS Capital alleged the following: "Despite its inclusion in the [Certificate], the disclaimer language on the insurance application and the e-mail from [UPS Capital] bringing attention to the existence of the FPA provision, [Murray] never inquired with [UPS Capital] about the meaning of 'All-Risk' or ['FPA'], or 'Free of Particular Average' or 'Warranted free from Particular Average.'" It asserted, "[Murray] never gave any indication to UPS Capital that he did not understand the meaning or effect of the FPA coverage applicable to his shipment versus ['All-Risk'] coverage." Additionally, "[Murray] never raised any questions with UPS Capital regarding the insurance procured generally, *e.g.,* what risks were covered, what risks were not covered, *etc.*" It noted Murray never raised any questions, complaints, requests to change the policy before the computer equipment shipped. Murray also did not tell UPS Capital he did not understand the policy or believed the shipment was insured "in case of *any* loss or damage by UPS or under [the] broader 'All-Risk' coverage terms."

UPS Capital clarified Murray "never made any requests as to specific coverage other than what [was] contained in the communications" with UPS Capital "which merely identify the carriage, route and type, the description and value of the cargo, *etc.*" UPS Capital maintained Murray never requested insurance to cover risks of partial loss or damage and "[a]t no time" did UPS Capital "make any coverage representations" about the purchased insurance "(*e.g.*, it was adequate, sufficient, good, perfect, better, full, or complete, *etc.*)"

In light of the above facts, UPS Capital argued Murray's contract cause of action failed for the following reasons: "Given the lack of any evidence [Murray] made a specific request for lacking coverage or the indisputable evidence that [he] accepted the insurance provided without any inquiry or complaint, there is no evidence for [Murray] to establish [UPS Capital] had a contractual obligation to provide the lacking coverage much less that it breached such an obligation."

As for the negligence cause of action, UPS Capital noted the claim was based on two theories. First, Murray alleged UPS Capital owed "a duty of care to disclose other available insurance products and provide an opportunity to purchase insurance not covered in the insurance product that was procured." Second, Murray maintained UPS Capital had a duty of care to fully explain the Certificate's FPA provision. UPS Capital asserted that as a matter of law an insurance agent's duty of care would not include the tasks Murray raised in his complaint. It reasoned that because the communications between it and Murray did not give rise to a special duty of care, "the onus was on [Murray] to tell [UPS Capital what [he] needed." Because Murray's request did not include any "specificity with regard to coverage needed," UPS Capital's general duty of care did not include the responsibility of making sure Murray had "adequate coverage to protect against all eventualities including the one which resulted in the denial of coverage under the insurance procured."

## II. *Opposition to Summary Judgment Motion*

In his opposition, Murray cited case authority holding an insurance agent may assume additional duties by an express agreement or holding itself out as being a specialist. Relying on the evidence submitted by UPS Capital, Murray asserted the broker "clearly holds itself out as specializing in inland marine insurance covering UPS shipments [and it] acted as an agent for [Tokio,] which issued house policies for both FPA as well as All-Risk coverage." He added that because UPS Capital "'holds itself out' as having expertise in this field" it had "a duty to inform the casual lay customers . . .

6

of the basic coverage details of the insurance they are going to purchase." Murray elaborated UPS Capital owed a special duty because it was only a broker "of marine or inland marine coverages, not the common homeowner's, or automobile liability insurance, [and] had the obligation at least to advise of, if not offer, the available coverages and explanations of those coverages."

To support these assertions, Murray cited to Travis Dixon's declaration, filed in support of the motion for summary judgment. Dixon was a Senior Marketing Product Manager with UPS Capital. He declared UPS Capital was "a licensed insurance broker in all 50 states" and a "wholly owned subsidiary of [UPS], but does not operate transportation equipment, nor provide or arrange for transportation or logistics services as does UPS and other UPS companies."

Dixon also described the types of policies offered by UPS Capital as follows: "[It] maintained, a 'house' or 'open' policy of insurance with insurer Tokio . . . under which [UPS Capital had] the liberty to include customer's shipments of cargo." The policy in effect provided coverage for both international shipments and domestic shipments and was "specifically endorsed to cover U.S. domestic inland shipments by truck[.]" He noted, "A customer's shipment need not be transported by UPS in order to be included by [UPS Capital] for coverage under the Policy." To include a cargo shipment, UPS Capital would report shipment details to Tokio, who would generate a Certificate "thereby confirming the shipment's inclusion for coverage under the Policy."

Dixon confirmed Tokio issued two types of coverage. "As is consistent with marine and inland marine insurance policies generally, there are two fundamental types of coverage afforded under the Policy: 'All-Risk' and 'FPA' (Free of Particular Average) . . . 'All-Risk' is the broadest form of coverage and insures cargo in the event of physical loss or damage from any external cause subject to exclusions of specific risks. 'FPA' coverage[,] on the other hand, insures exclusively against total loss (such as theft) except that partial losses are covered in the event of specifically named catastrophic

7

perils as set forth within the FPA clause. Whether a shipment will be insured 'All-Risk'' or 'FPA' depends upon the commodity. As is consistent with marine and inland marine insurance policies generally, used items are insured 'FPA' under the Policy because their pre-shipment condition is unknown to the insurer. This is set forth on the second page of the Policy Conditions[.]"

Murray disputed UPS Capital's claim the application clearly denoted the policy could not be for All-Risk coverage. As noted by Dixon in his declaration, UPS Capital sent Murray an application containing the following language on the first page: "Used items will not be insured 'All-Risk.'" Dixon concluded that because Murray completed the application and identified his shipment as being comprised of used items it was undisputed he understood the shipment would not have All-Risk coverage. Murray refuted this claim by pointing out the application's second page containing payment information. Under the section stating the cost of the policy and that there would be a $100 deductible, the application indicated the coverage was All-Risk. Specifically, the application contained the following statement: "Coverage: All Risk/Other (To be completed by UPS Capital)." Nowhere on the application were the terms FPA, FPA provision, FPA coverage, or "Free from Particular Average" mentioned.

Murray noted Dixon stated in his deposition the word "'Other'" on the second page of the application referred to FPA or a different kind of coverage. When asked why the words "'All-Risk'" were not crossed out, Dixon explained, "We just generally leave that wide open like that. It's 'All Risk,' slash, 'Other,' so you're just paying for the coverage that you're purchasing. You're not slashing or circling or anything. You're just leaving it completely open." Dixon conceded Murray could have purchased "All-Risk" coverage for his used computer equipment in a one-time only shipment "if there was some type of inspection or pre-shipment survey." Dixon said that Murray indicated he needed coverage for the same day he purchased the equipment. If Murray had wanted "All-Risk" coverage they would have needed time to contact Tokio

8

and "see what special considerations could have been put in place." Because none of this information was included in the application, Murray concluded any customer could reasonably assume the coverage was "All-Risk" despite the fine print statement on the first page. Moreover, Murray asserted that if he had been told about this option of better All-Risk coverage he would have delayed the shipment for the necessary survey.

Murray also disputed what reasonable inferences were created by UPS Capital's e-mail to him after he confirmed he was shipping used goods. The e-mail stated the following: "FYI: We abide by FPA coverage guidelines for used goods" and quoted the exact language Tokio would include the policy's FPA provision. Murray explained UPS Capital did not provide any explanation about the FPA provision listed in the e-mail. Moreover, Murray asserted UPS Capital sent an e-mail which created the inference his shipment would be covered for partial or total damage in transit. Specifically, the e-mail provided the following information: "Your COI has been processed successfully and is attached, which covers your shipment from Irvine, [California] to Spring, [Texas]. Your original receipt of payment is also included for reference. Keep this certificate on file for your records. As a friendly reminder, always leave any 'Declared Value' fields blank and *do not opt for additional package or freight liability coverage when shipping with UPS insurance*." (Italics added.) Murray asserted he would have asked about FPA coverage, but this "friendly reminder" caused him to believe there was no need to question the scope of coverage because it included partial or total damage regardless of the cause. For this reason, he disagreed with UPS Capital's claim it was undisputed he never gave any indication he did not understand the FPA provision or questioned the scope of insurance procured. Murray complains, "[This] statement might be considered misleading, if not actually misrepresenting the nature and scope of the FPA coverage."

Murray concludes the insurance application wherein he identified the shipment as being comprised of used items clearly conveyed the need for "*insurance* for an interstate UPS motor carrier shipment of used computer equipment, making no

9

distinction between coverage for a total loss or just partial loss or for that matter, the cause of the loss." He argues, "That should have been enough for [UPS Capital] to advise Murray of both the FPA and All-Risk house policy options particularly where FPA does not provide coverage for less than a total loss caused by mishandling of cargo, a frequent cause of damage to interstate motor carrier shipments."

The trial court granted UPS Capital's motion for summary judgment and dismissed the lawsuit. It concluded Murray's claims for breach of contract and negligence were based on UPS Capital's purported affirmative duty to assist him in purchasing an insurance product that covered the "risks of damage to cargo in the ordinary course or truck transport—or at the very least, to inform [Murray] of the availability of such products and to explain fully the technical 'FPA' provision." The court reasoned, "Generally speaking, California law is well settled as to the limited duty of insurance brokers, which is only to use reasonable care, diligence, and judgment in procuring the insurance requested by an insured. (*Travelers Property Casualty Co. of America v. Superior Court* (2013) 215 Cal.App.4th 561, 578-579 [(*Travelers*)] [citations and quotations omitted]; see also *Jones v. Grewe* (1987) 189 Cal.App.3d 950, 954-955.)" The court also acknowledged there were three exceptions to the general rule outlined in the *Travelers* case and *Kitzpatrick v. Hayes* (1997) 57 Cal.App.4th 916 [re: insurance agents] (*Kitzpatrick*).)

Applying this legal authority, the trial court determined UPS Capital met its burden of showing it "had no duty above and beyond those normally found in any agency relationship" because Murray asked for same-day insurance coverage for used computer equipment and was advised "All-Risk" protection was not available for cargo described as used. The court noted Murray did not seek additional information or ask about other insurance options. The court recognized Murray's theory UPS Capital held itself out as having "expertise in the inland marine insurance," however, Murray failed to provide evidence "that would allow a reasonable trier of fact . . . to conclude as much." It

10

reasoned, although UPS Capital sells "a specialized type of insurance," Murray needs to provide something more to create a reasonable inference UPS Capital "'held itself out as an expert in that particular field.'" In addition, the court rejected Murray's argument UPS Capital had an independent, affirmative duty to advise him about the relevant FPA provision written in "'archaic language.'" It determined this claim was contrary to established case law.

## DISCUSSION

### I. *Standard of Review*

"Summary judgment is a severe remedy which is to be granted with caution." (*Paper Savers, Inc. v. Nacsa* (1996) 51 Cal.App.4th 1090, 1094.) "A court shall grant a motion for summary judgment if all the papers show there is no triable issue as to any material fact and the moving party is entitled to a judgment as a matter of law. [Citation.]" (*Nealy v. City of Santa Monica* (2015) 234 Cal.App.4th 359, 370.) "We review a trial court's grant of summary judgment de novo. [Citation.] '[T]he party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact.' [Citation.]" (*Casey v. Perini Corp.* (2012) 206 Cal.App.4th 1222, 1228.) Once the defendant has met its burden, the party opposing summary judgment "shall not rely upon the allegations or denials of its pleadings," but rather "shall set forth the specific facts showing that a triable issue of material fact exists . . . ." (Code Civ. Proc., § 437c, subd. (p)(2).)

On appeal, "[w]e review the record and the determination of the trial court de novo. [Citation.]" (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1003.) "In performing our de novo review, we must view the evidence in a light favorable to plaintiff as the losing party [citation], liberally construing [the plaintiff's]

evidentiary submission while strictly scrutinizing defendants' own showing and resolving any evidentiary doubts or ambiguities in plaintiff's favor. [Citations.]" (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768-769 (*Saelzler*).) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, fn. omitted.)

II. *Issues on Appeal*

In his appellate briefing, Murray focuses on the negligence cause of action, and not the breach of contract action. We appreciate the issue of UPS Capital's contractual obligation overlaps with the primary issue of his negligence claim, i.e., whether UPS Capital had a special duty of care to procure adequate insurance and assist Murray in understanding the scope of coverage. However, as noted by UPS Capital, by failing to set forth any legal analysis on the contract claim Murray has waived any other challenges to the court's ruling on the contract claim. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785 [appellant must present reasoned argument]; *In re Marriage of Nichols* (1994) 27 Cal.App.4th 661, 672-673, fn. 3 [reviewing court may disregard contentions unsupported by legal or factual analysis]; *Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979.)

III. *Negligence*

Murray contends the trial court erred in finding that the complaint did not adequately allege negligence liability because he failed to present facts establishing UPS Capital owed a heightened duty to advise Murray that All-Risk insurance was available and/or explain the limitations of FPA coverage. We found no published cases on the issue of whether insurance brokers, selling one kind of policy, automatically assume additional duties simply because they are specialists, implicitly holding themselves out as having expertise in that given field of insurance. Murray proposes we create a per se rule

imposing a heightened duty of care for all specialized agents/brokers. While we decline to institute such a rule, we conclude public policy supports the creation of a reasonable inference of expertise when there is evidence the agent specializes in a particular field of insurance. In this case, the undisputed evidence of UPS Capital's specialization, in addition to Murray's other evidence, created a triable issue of material fact that if found true in Murray's favor would show UPS Capital assumed a special duty to advise Murray about the limited coverage available to ship his used goods with UPS.

A. *General Rules Regarding Any Agency Relationship*

As a general rule, an insurance agent "assumes only those duties found in any agency relationship such as 'reasonable care, diligence, and judgment in procuring the insurance requested by an insured.' [Citations.]" (*Paper Savers, Inc. v. Nacsa* (1996) 51 Cal.App.4th 1090, 1095 (*Nacsa*).) An insurance agent has no duty to affirmatively advise an individual seeking insurance about different or additional coverage. (*Jones v. Grewe* (1987) 189 Cal.App.3d 950, 954; see also *Gibson v. Government Employees Ins. Co.* (1984) 162 Cal.App.3d 441, 452 [holding no fiduciary duty "to (1) make available to them a particular kind of insurance, (2) advise them of the availability of such coverage elsewhere in the industry, or (3) advise them of inadequacies in coverage of which plaintiffs should, as reasonable persons, have themselves been aware"].)

However, an insurance agent may assume a greater duty to the insured when one of the following three exceptions arise: "(a) the agent misrepresents the nature, extent or scope of the coverage being offered or provided [ . . . ], (b) there is a request or inquiry by the insured for a particular type or extent of coverage [ . . . ], or (c) the agent assumes an additional duty by either express agreement or by 'holding himself out' as having expertise in a given field of insurance being sought by the insured." (*Fitzpatrick, supra,* 57 Cal.App.4th at p. 927).)

13

"'[W]hether a duty of care exists is a question of law for the court. [Citations.]  Also, whether, and the extent to which, a new duty is recognized is ultimately a question of public policy.  [Citation.]'  [Citation.]" (*Fitzpatrick, supra,* 57 Cal.App.4th at p. 920.)  Any extension of these existing exceptions or creation of a new duty is ultimately a question of public policy.  (*Id.* at p. 920.)

B.  *Extended Duty of Care*

As noted above, the *Fitzpatrick* case delineated three exceptions to the general rule limiting an agent's duty of care.  Murray asserts specialized agents, such as UPS Capital, are "holding themselves out as having expertise" and fall within *Fitzpatrick's* third exception (Exception C).  We found no case law specifically defining the phrase "holding themselves out as having expertise."  In determining what factors should be considered when applying this exception, it is helpful to first parse through existing case law.

The 1987 *Jones* case provides the starting framework for determining what constitutes "holding out" oneself out as having expertise.  (*Jones, supra,* 189 Cal.App.3d at p. 954.)  In *Jones*, a minor fell into a swimming pool and suffered serious injuries.  (*Id.* at p. 953.)  After settling with the family, the apartment building owners (landlords) filed a lawsuit against the agents who insured the apartment building, arguing they breached their duties by not providing enough insurance to cover the apartment building's liabilities.  (*Ibid.*)  The landlords argued they were relying on the expertise of the insurance agents due to their past relationship of purchasing policies and history of relying on the agent's advice on insurance matters.  (*Id.* at p. 956.)

The court's majority sustained the agent's demurrer, adopting the reasoning provided by a 1984 Iowa Supreme Court opinion and a treatise on insurance law.[1] (*Jones, supra,* 189 Cal.App.3d at p. 954.)  Relying on *Sandbulte,* the majority in *Jones* held an insurance agent only assumes "those duties normally found in any agency relationship" and "[t]he mere existence of such a relationship imposes no duty on the agent to advise the insured on specific insurance matters."  (*Jones, supra,* 189 Cal.App.3d at p. 954.)  But the court also recognized an agent may "assume additional duties by an express agreement or a holding out," and that "the agent may be liable to the insured for losses which resulted as a breach of that special duty."  (*Id.* at pp. 954-955.)

"The mere allegation in a complaint . . . that an insured has purchased insurance from an insurance agent for several years and followed his advice on certain insurance matters [was] insufficient to imply the existence of a greater duty.  Such reliance is not at all uncommon when an insured has done business with an insurance agency over a period of time.  [Citation.]  Nor can the existence of a broader agency relationship warranting the imposition of a greater duty be reasonably inferred from the complaint's allegation that respondents had assured appellants of the adequacy of their liability coverage.  As the court noted in *Sandbulte* . . . an insured's request for 'sufficient coverage' and an agent's assurance that the policy provided 'adequate' coverage do not, in and by themselves, imply an 'expanded principal-agent relationship.'  Such an exchange usually occurs within the context of the general principal-agent relationship.

---

[1]  Our Supreme Court embraced the holding of *Sandbulte v. Farm Bureau Mut. Ins. Co.* (Iowa 1984) 343 N.W.2d 457, 464 (*Sandbulte*), which cited extensively to 16A Appleman, *Insurance Law & Practice* (1981) § 8836, pp. 64-66.)  However, in 2010 the Iowa Supreme Court overruled *Sandbulte* in *Langwith v. American National General Insurance Co.* (Iowa 2010) 793 N.W.2d 215, 223-224 (*Langwith*), abandoning the "restrictive requirements for an expended agency duty."  And then *Langwith* was legislatively overruled the following year; the Legislature codified the requirements of *Sandbulte* in Iowa Code section 522B.11(7).  In short, *Sandbulte* is still good law in Iowa.

'Purchasers of insurance generally seek "sufficient coverage."' [Citation.] To imply the existence of a broader agency agreement from such an exchange, the *Sandbulte* court said, would in effect make the agent 'a blanket insurer for his principal.' [Citation.]" (*Jones, supra,* 189 Cal.App.3d at p. 956.)

While the *Jones* majority held continued reliance was not enough to imply expertise, the court declined to define what would have implied expertise. Further, the court considered public policy implications and ultimately declined to expand the principal-agent relationship duty because "[n]either an insurance agent nor anyone else has the ability to accurately forecast the upper limit of any damage award in a negligence action against the insured by a third party." (*Jones, supra,* 189 Cal.App.3d at p. 957.) In short, because the landlords had unfettered access to the information required to properly calculate their liability insurance, whereas the insurance agent did not, and because future catastrophes are unforeseeable, the responsibility ultimately rested with the landlords to determine their upper limit. (*Ibid.*)

In his dissent, Justice Lui concluded the complaint stated facts from which a special duty could reasonably be inferred. (*Jones, supra,* 189 Cal.App.3d at p. 958 (dis. opn. Lui, J.).) He read the complaint to say the agents "represented themselves to be experts at procuring appropriate liability insurance and encouraged appellants to depend and rely on their advice, service, and expertise; they also expressly and impliedly represented that the insurance protection obtained by them was 'adequate.'" (*Ibid.*) Justice Lui noted the majority relied on *Sandbulte,* which had declined to find an expanded agency agreement "but noted situations where a special duty might arise, for example, when 'there is a long-established relationship of entrustment between insurance counselor or agent and client from which it clearly appears that the counselor appreciated that there was a duty to take the initiative in giving comprehensive advice to [the] client on insurance matters. . . .' [Citation.]" (*Ibid.*)

16

Justice Lui also noted the *Sandbulte* court relied on "Appleman, Insurance Law and Practice (1981) section 8836, at pages 64-66 as follows: 'Ordinarily, of course, an insurance agent assumes only duties normally found in an agency relationship . . . and he assumes no duty to advise the insured merely by such relationship. However, where an agent holds himself out as a consultant and counselor, he does have a duty to advise the insured as to his insurance needs, particularly where such needs have been brought to the agent's attention. And in so doing, he may be held to a higher standard of care than that required of the ordinary agent since he is acting as a specialist. Accordingly, the agent may be liable to an insured for the damage suffered by his failing to inform him as to a potential source of loss and by his failing to recommend insurance therefor.'" (*Jones, supra,* 189 Cal.App.3d at p. 958 (dis. opn. Lui, J.).)

Fast forward 25 years, and the Iowa Supreme Court has overruled its *Sandbulte, supra,* 343 N.W.2d 457 decision in *Langwith, supra,* 793 N.W.2d at page 224. It stated the following: "[T]he circumstances under which an expanded agency agreement could arise were narrowly circumscribed in *Sandbulte*: 'the agent holds himself out as an insurance specialist, consultant or counselor and is receiving compensation for consultation and advice apart from premiums paid by the insured.' [Citation.] Although this court cited some authority for its holding in *Sandbulte*, we gave no rationale for such a restrictive approach. [¶] Our examination of the general principles governing agency relationships convinces us that a more flexible method of determining the undertaking of an insurance agent is appropriate." (*Langwith, supra,* 793 N.W.2d. at p. 221.)

Relying heavily on The Restatement Third of Agency the court in *Langwith* determined an insurance agent's ordinary duty can be changed and expanded by agreement of the parties. (*Langwith, supra,* 793 N.W.2d at p. 221.) "The defendants have advanced no reason, nor have we identified one, that would justify the limitations placed on the circumstances that might be considered in determining the duty undertaken

17

by an insurance agent, as stated in *Sandbulte*.  Therefore, we hold that it is for the fact finder to determine, based on a consideration of all the circumstances, the agreement of the parties with respect to the service to be rendered by the insurance agent and whether that service was performed with the skill and knowledge normally possessed by insurance agents under like circumstances.  [Citation.]" (*Langwith, supra,* 793 N.W.2d at p. 221.)

The *Langwith* expansion of the exception was legislatively overturned in 2011 (2011 Iowa Acts ch. 70, § 45), when the Legislature enacted Iowa Code section 522B.11(7), which provided, inter alia the following:  "Unless an insurance producer holds oneself out as an insurance specialist, consultant, or counselor and receives compensation for consultation and advice apart from commissions paid by an insurer, the duties and responsibilities of an insurance producer are limited to those duties and responsibilities set forth in *Sandbulte* . . . ."  The Legislature determined insurance brokers should not have higher or greater duties except in narrowly defined circumstances.

This above history is noteworthy because it highlights how the *Jones* court disagreed with and refused to adopt all of *Sandbulte*'s analysis and holding.  Neither the majority nor dissenting opinion mentioned the Iowa Supreme Court's restrictive approach in defining an agent's expanded duty (that was later codified).  Instead, the *Jones* court adopted a totality-of-circumstances analysis, leaving it to the fact finder to examine multiple factors to decide if the insurance broker/agent assumed a special duty by holding themselves out as having expertise.  As we will now discuss, other courts in California have adopted a similar flexible approach.

Returning to California jurisprudence, in 1997 the appellate court in *Fitzpatrick* carefully examined the existing applicable case law and synthesized three succinct exceptions to the "no duty" principle announced in *Jones.* (*Fitzpatrick, supra,* 57 Cal.App.4th pp. 923-927.)  The *Fitzpatrick* first exception, when "the agent misrepresents the nature, extent or scope of the coverage being offered or provided"

18

(Exception A), was based on the court's analysis of three cases. (*Fitzpatrick, supra,* 57 Cal.App.4th at p. 927, citing *Nacsa, supra,* 51 Cal.App.4th 1090 [agent misrepresented policy provided full coverage to replace business personal property in case of total loss]; *Desai v. Farmers Ins. Exchange* (1996) 47 Cal.App.4th 1110 (*Desai*) [agent misrepresented insured getting 100 percent replacement cost coverage with real property insurance policy]; and *Free v. Republic Ins. Co.* (1992) 8 Cal.App.4th 1726 (*Free*) [homeowner specifically inquired if coverage limits adequate to rebuild home].)

The second exception, when "there is a request or inquiry by the insured for a particular type or extent of coverage" (Exception B), was based on the *Fitzpatrick* court's analysis of *Westrick v. State Farm Insurance* (1982) 137 Cal.App.3d 685 (*Westrick*). (*Fitzpatrick, supra,* 57 Cal.App.4th at p. 927.) In *Westrick,* an insurance agent failed to disclose facts about immediate coverage for a recently purchased truck in response to a specific inquiry about coverage. (*Westrick, supra,* 137 Cal.App.3d at pp. 688-689.) The court determined the agent had a duty to explain a limiting provision to the insured because the insured made prior inquiries regarding coverage of a welding truck under his existing policy and the agent had superior knowledge of the scope of the policy's automatic coverage clause. (*Id*. at pp. 691-692.)[2]

Relevant to this case, the *Fitzpatrick* court described the third exception, Exception C, as applying when "the agent assumes an additional duty by either express agreement or by 'holding himself out' as having expertise in a given field of insurance being sought by the insured (as in *Kurtz*)." (*Fitzpatrick, supra,* 57 Cal.App.4th at p. 927, citing *Kurtz, Richards, Wilson & Co. v. Insurance Communicators Marketing Corp.* (1993) 12 Cal.App.4th 1249 (*Kurtz*).) The court briefly described the *Kurtz* case, where

---

[2] We disagree with Murray's contention this case supports his appeal. Exception B required evidence of a request or inquiry for specific insurance to create a special duty. Murray only presented evidence he did not understand inland marine insurance and he was relying on UPS Capital's expertise to select appropriate coverage. Thus, the *Westrick* case is not applicable.

19

the court overruled an order sustaining a demurrer without leave to amend after concluding the complaint alleged the plaintiff "in its quest for group medical, life and accident insurance for its employees, had relied on the defendant broker 'who held themselves out as expert brokers and agents in the field.'" (*Fitzpatrick, supra,* 57 Cal.App.4th at p. 925.)

In the *Kurtz* case, plaintiffs were "not knowledgeable in the field of medical, life, and accident insurance, and throughout the process of obtaining insurance relied on" the insurance brokers. (*Kurtz, supra,* 12 Cal.App.4th at pp. 1254-1255.) As part of the application process, plaintiff's treasurer signed a certificate stating the group plan was not subject to the Medicare provisions of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA). Before signing the certificate, plaintiff asked the agent what it meant. (*Id.* at p. 1255.) The agent responded plaintiff was not subject to the Medicare provisions of TEFRA and "urged him to sign the certificate." (*Ibid.*) Two years later, several employees became seriously ill and the insurance company cancelled the policy and demanded reimbursement for amounts paid out because the insured falsely represented on the certificate that it was not subject to Medicare. (*Ibid.*) Plaintiff sued the agent for fraud, negligent misrepresentation, and negligence. (*Ibid.*)

On the element of duty, the *Kurtz* court rejected the agent's argument it only owed a duty to the insurer and not the insured. (*Kurtz, supra,* 12 Cal.App.4th at p. 1257.) It acknowledged the general no duty rule set forth in *Jones* and noted "[a]n agent may assume additional duties by an agreement or by holding himself or herself out as having specific expertise. [Citation.]" (*Ibid.*) The court concluded the complaint alleged facts that if true would establish the agents "entered into a relationship with [the insured,] which [give] rise to a duty of care, including a special duty assumed when they held themselves out as experts on TEFRA." (*Ibid.*) Unfortunately, for purposes of our analysis, the court in *Kurtz* did not specify what facts established the agents *held themselves out* as experts on TEFRA. However, what was plainly obvious in this case

20

was there was evidence the parties' interaction created a dependent relationship, whereby the client became reliant on the expert advice of the insurance agent. Due to multiple factors, the court ruled a jury could reasonably conclude the agent assumed additional duties to correctly advise his client and meet his specific insurance needs.

Returning to the *Fitzpatrick* case, the court granted an insurance agent's motion for summary judgment, rejecting the insured's argument Exceptions B and C applied, or that public policy called for an expanded duty of care. (*Fitzpatrick, supra,* 57 Cal.App.4th at pp. 929-930.) In that case, a family (the insured) sued their agent, alleging he negligently failed to advise about the availability of a personal umbrella policy in addition to an automobile policy. In arguing Exception C applied, the insured presented the following facts: (1) the agent knew the insured wanted the upper limits of coverage, and despite knowing State Farm offered a $1 million personal umbrella policy at no substantial additional costs, the agent told the insured the coverage procured was adequate; and (2) State Farm held its agents out as experts in giving advice regarding coverage and advertised this expertise in its brochure. (*Id.* at pp. 927-928.)

The court in *Fitzpatrick* rejected application of Exception C, concluding State Farm's brochure (which the insureds never saw) merely suggested that the insured ask himself (and then the agent) about additional insurance needs was "far from a 'holding out' of special expertise . . . ." (*Id.* at p. 929.) The court noted the brochure "in very bland terms" suggested "that the insured ask himself or herself—and perhaps then the agent—about additional insurance needs." (*Ibid.*) The advertisement was insufficient evidence the agent was holding itself out as experts in the car insurance field.

The court also rejected the "invitation" to expand the duties of insurance agents and brokers to affirmatively volunteer advice about the need for additional umbrella coverage. (*Fitzpatrick, supra,* 57 Cal.App.4th at p. 929.) "The factors cited by [the insured] in favor of such an expanded duty, e.g., the longtime relationship between them and their agent, the generally superior knowledge of the agent regarding coverages,

21

the agent's review of the policies issued, etc., were almost all present in the authorities discussed above in which the courts have steadfastly refused to find any such enlarged duty. Even if we were disposed to expand the scope of tort duties generally, which we are not, this record simply does not present an appropriate basis upon which to do so." (*Id.* at pp. 929-930.)

In their briefing, UPS Capital and Murray both cite to *Travelers, supra,* 215 Cal.App.4th 561. Murray asserts *Travelers* supports his position that Exception C applies to specialists. We agree with UPS Capital's reading of the case as merely reaffirming settled law that insurance brokers owe a limited duty to their clients unless the agent assumes additional duties. (*Id.* at pp. 579-580.) While the case provides a helpful outline of the general rule, it does not offer any insight into what characterizes holding oneself out as having expertise in a field of insurance.

Both UPS Capital and Murray also discuss *Williams v. Hilb, Rogal & Hobbs Ins. Services of California, Inc.* (2009) 177 Cal.App.4th 624, 628 (*Williams*), a more helpful case that applied Exception C. In the *Williams* case, the owner of a spray-on truck bed lining dealership brought an action against an insurance agency (the agency) after an injured worker obtained a multimillion dollar judgment. (*Id.* at p. 627.) The owner alleged the agency was liable for negligently "advising on, procuring, and maintaining an insurance package for a new business venture that did not include workers compensation insurance." (*Ibid.*) The trial court determined the agency was liable and the appellate court agreed, concluding there was ample evidence the agency's representative (the agent) held herself out as having expertise in the insurance needs of the dealership, creating a special duty of care. (*Id.* at pp. 637, 640.)

The court in *Williams* specifically highlighted the following evidence as being relevant to its analysis: (1) the agent previously worked with the owners to bundle insurance plans needed for other dealerships and represented herself as "'the expert on the product necessary to satisfy [the dealership's] insurance needs'"; (2) the agent told

22

the owners a meeting to discuss insurance plans was not necessary because of her expertise; (3) the owner did not request specific insurance and asked the agent for insurance "needed to operate the business"; (4) the owner understood the agent was "the go-to person" for dealership insurance needs; (5) the owner filled in basic information but left blank all the portions of the application relating to insurance coverages; (6) the agent selected the insurance coverages and did not give it to the owner to review before she submitted it to the insurance company; (7) the agent was aware that employees spraying paint had "the most dangerous jobs and that it would be important for a sprayer's employer to know if its insurance provided coverage for on-the-job injuries"; (8) she was aware workers compensation insurance was mandatory in California; and (9) the agent represented and marketed the insurance package as having been specifically designed for the owner. (*Williams, supra,* 177 Cal.App.4th at pp. 627-628.) It was not until after one of the sprayers became severely injured in a fire that the owners learned they did not have the necessary workers compensation coverage. (*Id.* at p. 629.)

The court rejected the agency's argument there was no legal basis for finding the agent's expertise "created a heightened duty to [the owners], because '[a]ny expertise that she possessed did not extend to worker's compensation insurance, which was outside the scope of her alleged expertise concerning the insurance needs of [the dealership,]' and because [the owners] 'never knew about the supposed expertise, and never relied on it.'" (*Williams, supra,* 177 Cal.App.4th at p. 637.) The court noted the first claim was contradicted by the agent's own claims her staff calculated workers compensation premiums and she spoke with the owners about such insurance before she sent her insurance proposal. The second claim was refuted by the owner's testimony he understood the agent was "'the go-to person'" for the dealership's insurance needs and he relied on her expertise and selection of insurance coverages. (*Ibid.*) The court held there was "plenty of evidence" to support the trial court's finding the agent "held herself out as having expertise in the insurance needs of . . . [the] dealerships . . . ." (*Ibid.*)

23

UPS Capital argues *Williams* is inapplicable to the facts because "[t]he special expertise that formed the basis for the application of the exception was not merely selling a particular bundle of insurance products exclusively for [the truck lining] dealerships but rather being an expert on the products necessary to satisfy a new dealership's insurance **_needs_**." However, this analysis misstates the exception. The law does not necessitate an insurance agent be an expert in the *needs* of a particular client, nor does it only require the agent to procure what is mandated by law. Rather, *Williams* applied Exception C because the agent held herself out "'as having expertise in a given field of insurance being sought by the insured.' [Citation.]" (*Williams, supra*, 177 Cal.App.4th at p. 636.) Therefore, contrary to UPS Capital's argument, to satisfy Exception C, there need only be evidence UPS Capital held itself out as having expertise in inland marine insurance, it did not need to be an expert in Murray's particular needs.

We are also not persuaded by UPS Capital's interpretation of the case as narrowly defining an agent's heightened duty as not including the obligation to present or explain insurance options. It maintains the duty was limited to procuring insurance legally required. The court in *Williams* determined that when an agent assumes additional duties, this may include a *duty to advise* because the insured is relying on "some level of expertise with respect to" the client's insurance needs. (*Williams, supra*, 177 Cal.App.4th at p. 637.) The court unequivocally stated liability was based on the agent's "*failure to advise* [the owner] of the necessity for [worker's compensation] insurance, and that it was not included in her package for [the] dealerships." (*Ibid.,* italics added.) It ruled the agent "breached the duty she assumed by holding herself out as 'the expert on the product necessary to satisfy [the dealership's] insurance needs.'" (*Ibid.*) We are unaware of any reason why the *duty to advise* would be limited to only state-mandated insurance. Because an insured is relying on the agent's expertise, the duty to advise logically extends to relevant coverage information within the agent's

24

"expertise in a given field of insurance being sought by the insured." (*Fitzpatrick, supra,* 57 Cal.App.4th at p. 927.)

## C. *Our Resolution of the Factors Relevant to Exception C*

As mentioned, published case law in California regarding Exception C has not yet addressed the question of whether insurance brokers, who sell specialized insurance, impliedly hold themselves out as experts. Our review of existing case authority revealed courts have adopted a flexible approach to determining whether a broker or agent has undertaken a heightened duty. We conclude neither case authority nor public policy support creation of a per se rule regarding specialists, but rather courts must utilize a totality of the circumstances approach.

Cases such as *Jones* and *Fitzpatrick* explain an agent cannot be deemed a specialist based on factors such as the length of the relationship with the insured, the agent's general superior knowledge regarding coverages, evidence the agent reviewed the policies, or unread brochures merely advertising agents are well trained to answer questions. Those courts also acknowledged the outcome in their cases would be different if the agent was an acknowledged specialist or consultant. The *Kurtz* and *Williams* cases expanded the scope of inquiry, focusing on factors relevant to examining the nature of the parties' interactions. It acknowledged the term "holding out" encompassed more than marketing tools (advertising and brochures) and could be based on an agent's reputation as the "go-to" specialist for a particular industry. Furthermore, the *Williams* court determined it can be reasonable to infer agents who customize insurance packages or sell exclusively to a distinct class of insured, by their actions, were proffering their expertise. It recognized another relevant factor for courts to consider is the degree of control the agent asserted in the relationship; if the agent selected the policy for the client then he or she has created an expectation of reliance in the agent's expertise in meeting the client's specific needs.

25

Additionally, we note the phrase "holding out" outside the context of insurance cases has multiple meanings. The dictionary offers the following definitions: (1) "to present as something realizable," (2) "proffer" and (3) "to represent to be." (<https://www.merriam-webster.com/dictionary/hold%20out> [as of Aug. 4, 2020]). Estate/paternity cases, often consider whether a father "openly holds out" the child as his natural child. (See *Estate of Burden* (2007) 146 Cal.App.4th 1021, 1028.) These cases agree the phrase "holds out" is synonymous with the term "acknowledge," which is commonly defined as "'"[T]o show by word or act that one has knowledge of and agrees to (a fact or truth) . . . [or] concede to be real or true . . . [or] admit."'" (*Id.* at p. 1029.)

Such far-reaching definitions align with the *Williams* multi-factor approach as well as public policy. As our society has evolved, the insurance industry has become more sophisticated and developed highly specialized policies, such as insuring body parts, e.g., Lloyd's insured actress America Ferrera's smile for $10 million.[3] There are countless industries that require specialized insurance coverage, and to meet these ever-changing needs, agents/brokers have developed expertise and skill sets tailored to their particular specialty. While general insurance brokers should continue to benefit from the public policy of protecting them from becoming "'a blanket insurer for his principal'" (*Jones, supra,* 189 Cal.App.3d at p. 956), the same cannot be said for this emerging group of highly specialized insurance brokers/agents. In light of all the above, we conclude evidence of specialization at a minimum creates a presumption the agent/broker anticipates their clients will rely on their acknowledged expertise and supports courts imposing an extended duty.

---

[3] <https://www.lloyds.com/about-lloyds/history/innovation-and-unusual-risks/going-out-on-a-limb.> [as of Aug. 4, 2020].

E. *Analysis*

As the moving party, UPS Capital had the initial burden to make a prima facie showing there was no triable issue of material fact regarding whether it owed Murray a heightened duty of care. It asserted the "undisputed communications" did not give rise to a special duty because the "onus was on Murray to tell UPS Capital what he needed." It stated an agent's general duty of care would not include advising Murray about the adequacy of coverage. Like the trial court, we conclude UPS Capital carried its burden of production and the burden shifted to Murray. (*Casey, supra,* 206 Cal.App.4th at p. 1228.)

We conclude Murray satisfied his burden. While UPS Capital's evidence adequately refuted application of Exception B (applicable when there is a request/inquiry), Murray's evidence raised a triable issue of material fact regarding application of Exception C.

Murray relied upon the following evidence to support his argument there was a triable issue of material fact regarding whether UPS Capital held itself out as having expertise in marine inland insurance. First, UPS Capital only offered one type of policy to one-time shippers, which had limited coverage depending on the type of goods being shipped (All-Risk or FPA provisions). Second, the policy was specifically endorsed to cover domestic inland shipments by truck. Third, USP Capital was a subsidiary of UPS, a shipping company. Fourth, in addition to being a licensed insurance broker in 50 states, UPS Capital acted as the agent for one insurance company, offering only Tokio's versions of inland marine insurance policy.

Fifth, UPS Capital offered UPS shippers its one "house" policy that was anything but understandable, especially to a one-time customer unfamiliar with marine transport insurance. The crucial provision explaining coverage is contained in a single,

27

lengthy, 95-word sentence.[4]  While the clause used ordinary sounding words, the scope of coverage is impossible to decipher.  Phrases like "Warranted free from Particular Average" and "discharge of cargo at port of distress" are abstruse and require an unexperienced reader to guess at the meaning.  Moreover, the policy inexplicably provided coverage for "any loss or damage" attributed to "conveyance with any external substance (ice included) other than water . . . . ."  (We are unsure, but we read this to mean loss caused by the solid state of water was covered, yet damage caused by the liquid or gas state of water were not.)  In any event, UPS Capital offered its customers only one marine inland policy (with two types of limited coverage), both of which plainly required some level of expertise to fully understand.

Murray presented additional evidence from which the trier of fact could reasonably infer UPS Capital was a highly specialized broker holding itself out as having expertise in inland marine insurance.  As described in Murray's declaration, a UPS agent recommended he call UPS Capital to secure the necessary insurance for his shipment of used computer equipment.  UPS's referral suggested UPS Capital was the industry's acknowledged "go-to" broker for inland marine shipping needs.  UPS did not offer Murray a list of possible insurance brokers to choose from, suggesting only UPS Capital possessed the expertise to assist Murray with purchasing the correct policy for his UPS shipment.

Furthermore, UPS Capital selected the policy for Murray.  After Murray contacted UPS Capital, an agent provided him with a two-page application/payment

---

[4]  The FPA provision stated the following:  "Warranted free from Particular Average unless the vessel or craft be stranded, sunk or burnt, but notwithstanding this warranty Underwriters are to pay any loss or damage to the interest insured which may reasonably be attributed to fire, collision or contact of the vessel and/or conveyance with any external substance (ice included) other than water, or to discharge of cargo at port of distress; and also to pay the insured value of any merchandise and/or goods jettisoned and/or washed or lost overboard, and the risks of theft of or non-delivery of an entire shipping package."

28

form, having the universally recognized UPS logo in the top right-hand corner. The first line simply stated the application was for "House Policy Coverage," next to the UPS logo, without any further explanation as to the type of policy. The rest of the application required Murray to provide basic contact information, a description of the type of goods, and specifications regarding how the shipment was packaged. Thus, the relationship was unlike the customers described in *Jones* and *Fitzpatrick*, in which the individual purchasing a general policy knows better than the agent about the risks of loss and the insured asset. In addition, above the signature line was the following disclaimer: "The carrier will rely on the representations provided by you in, and in connection with, this application when making decisions regarding any policy we may issue." A jury could reasonably infer the application was created by a specialty broker having expertise in selecting appropriate policies for their clients. Further evidence UPS Capital was holding itself out as having expertise in this niche market was its e-mail to Murray advising him to leave "any 'Declared Value' fields blank" on the UPS forms and to "not opt for additional package or freight liability coverage when shipping with UPS insurance." (Underline omitted.) UPS Capital knowledge and advice about UPS's shipping forms and whether it was necessary to purchase additional coverage in addition to its Tokio policy are additional factors suggesting it was holding itself out as having expertise in inland marine shipping insurance.

Looking at all of Murray's evidence, we conclude he met his burden opposing the motion for summary judgment. "[L]iberally construing [Murray's] evidentiary submission while strictly scrutinizing [UPS Capital's] own showing and resolving any evidentiary doubts or ambiguities in [Murray's] favor" (*Saelzler, supra,* 25 Cal.4th at p. 768), we conclude the evidence could allow a reasonable trier of fact to find Exception C applicable. Accordingly, the case must be remanded to permit a jury to resolve the triable issue of material fact as to whether UPS Capital was holding itself out

as having expertise in a specialized area of insurance, and therefore, assumed a heightened duty of care.

## DISPOSITION

We reverse the judgment and remanded the matter for further proceedings. Appellant shall recover his costs on appeal.

O'LEARY, P. J.

WE CONCUR:

BEDSWORTH, J.

GOETHALS, J.